KATHLEEN HILL, trustee,[1] *vs.* METROPOLITAN DISTRICT
COMMISSION & another.[2]

Middlesex. March 3, 2003. - April 29, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Massachusetts Oil and Hazardous Material Release Prevention Act. Massachusetts Tort Claims Act. Hazardous Materials. Governmental Immunity. Practice, Civil,* Instructions to jury, Attorney's fees, Costs. *Damages,* Hazardous waste contamination, Attorney's fees.

In an action under G. L. c. 32E by a landowner (plaintiff) seeking to recover from the Metropolitan District Commission (defendant) damages incurred as a result of releases of subsurface oil onto the plaintiff's property, the judge properly denied the defendant's posttrial motion to dismiss the G. L. c. 21E claim on the ground that the judgment against it must be limited to $100,000, the cap on liability for "public employers" under G. L. c. 258, § 2, because G. L. c. 21E's strict liability waiver of a public employer's sovereign immunity was subject to the immunities of G. L. c. 258, where the unambiguous terms of G. L. c. 21E subjected the defendant to liability, and where G. L. c. 258 and G. L. c. 21E were intended to be interpreted as separate waivers of sovereign immunity, concerning distinct categories of claims, with separate rights and procedures. [269-273]

In an action under G. L. c. 21E by a landowner (plaintiff) seeking to recover from the Metropolitan District Commission (defendant) damages incurred as a result of releases of subsurface oil onto the plaintiff's property, the judge correctly allowed in part the defendant's motions for judgment notwithstanding the verdict by vacating the portion of the jury's verdict awarding the plaintiff $2.4 million for diminution in the fair value of the property, where the plaintiff failed to satisfy the burden placed on it by the judge's unobjected-to instructions of proving that the oil contamination on its property was not reasonably curable by repairs or remediation. [273-277]

In an action under G. L. c. 21E by a landowner (plaintiff) seeking to recover from the Metropolitan District Commission and a second nearby landowner (defendants) damages incurred as a result of releases of subsurface oil onto the plaintiff's property, the judge's order denying the plaintiff's motion to recover its expert witness and attorney's fees under G. L. c. 21E, § 4A (*d*) (2) and (3), from the Metropolitan District Commission was supported by the evidence and based on credibility determinations within her province [277-278]; further, the judge did not abuse her discretion in denying the

[1]Of the A & P Realty Trust.
[2]Creative Realty Trust.

plaintiff's motion for expert and attorney's fees under G. L. c. 21E, § 15, from both defendants where, with respect to the second landowner, the claim was meritless, and where, with respect to the Metropolitan District Commission, the judge found that the plaintiff had deliberately and for no good reason breached the parties' agreement to mediate the entire dispute, thus extending by years the ultimate cleanup of the site [278-279].

CIVIL ACTION commenced in the Superior Court Department on November 24, 1995.

The case was tried before *Martha B. Sosman*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Mark W. Roberts* for the plaintiff.

*Howard R. Meshnick*, Assistant Attorney General, for Metropolitan District Commission.

*James P. DeMaria* for Creative Realty Trust.

*Adam D. Rogoff & Emily Joselson* for Mary Kathryn Lewis & others, amici curiae, submitted a brief.

GREANEY, J. The plaintiff, Kathleen Hill, trustee of the A & P Realty Trust (A & P), seeks to recover from the defendants, the Metropolitan District Commission (MDC), and Creative Realty Trust (Creative), landowners adjacent to A & P, damages incurred as a result of oil contamination of A & P's property. A & P's complaint, as far as now relevant, was based on G. L. c. 21E, the Massachusetts Oil and Hazardous Material Release Prevention Act. The jury found the defendants liable under G. L. c. 21E, § 5 (*a*) (1),[3] for releases of subsurface oil onto A & P's property, attributing only eight per cent of damages to Creative. The jury awarded "response costs" under G. L. c. 21E, § 4,[4] to A & P in the amount of $239,904.77. In addition, in

---

[3]General Laws c. 21E, § 5 (*a*) (1), imposes liability "without regard to fault," on "the owner or operator of . . . a site from or at which there is or has been a release or threat of release of oil or hazardous material."

[4]General Laws c. 21E, § 4, provides, in pertinent part, that "[a]ny person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil . . . shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action."

reply to special questions on damages sought pursuant to G. L. c. 21E, § 5 (*a*) (5) (iii),[5] the jury found that $500,000 "would [be] need[ed] . . . to remediate the oil contamination"; the oil contamination on A & P's property was not "reasonably curable by repairs or remediation"; and that $2.4 million "represent[ed] the diminution in fair market value of [A & P's] property caused by the oil contamination."[6]

The case is before us on cross appeals. The MDC appeals from the judge's denial of its posttrial motion to dismiss the G. L. c. 21E claim on the grounds that the claim is "subject to the immunities retained" under G. L. c. 258, commonly referred to as the Massachusetts Tort Claims Act, and is barred by G. L. c. 258, § 10 (*j*) and (*e*). A & P appeals from an order of the judge that allowed in part the defendants' motions for judgment notwithstanding the verdict (judgment n.o.v.), Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998), by setting aside the portion of the jury's verdict awarding A & P $2.4 million in property damage, but affirming the verdict in all other respects. A & P also appeals from an order of the judge denying its posttrial motion for attorney's and expert witness fees under G. L. c. 21E. We granted MDC's application for direct appellate review (with which A & P joined) and now affirm the orders and judgment.

There was evidence from which the jury could have found the following facts. In 1992, while removing a 6,000 gallon underground storage tank from its property that had been installed in 1980, and had been used to store heating oil, A & P discovered subsurface oil.[7] An investigation revealed that the oil was "highly aged," that its release had occurred prior to 1972, and that a large amount of oil, ranging from 20,000 to 90,000 gallons, had been released. Further investigation revealed that

---

[5]General Laws c. 21E, § 5 (*a*) (5) (iii), permits a private party to recover "damage to . . . real or personal property incurred or suffered as a result of [a] release or threat of release [of oil]."

[6]The plaintiff also sought declaratory and injunctive relief, but, after the jury's special verdict was returned, withdrew its request for any relief other than damages.

[7]The 6,000 gallon underground storage tank replaced a 1,000 gallon underground storage tank that had been installed in the mid-1960s and had been removed in December, 1979.

the release of oil had not come from either of the underground storage tanks that had been removed from A & P's property, nor from any other source on A & P's property. Rather, the oil was determined to have come from upgradient locations, namely property adjacent to A & P's owned by the MDC and Creative. The oil essentially had migrated to A & P's property consistent with the groundwater flow. Despite the contamination of its property, since 1993, A & P has been able to lease the property to an automobile dealership, and has collected substantial rental income over the years. At the time of trial A & P was collecting approximately $200,000 annually in rental income under the terms of the property's lease.

1. We reject the MDC's argument that the judgment against it must be reduced to $100,000, the cap on liability for "public employers" under G. L. c. 258, § 2,[8] because G. L. c. 21E's "strict liability waiver of a public employer's sovereign immunity [is] subject to the immunities of [G. L. c. 258]."

Under G. L. c. 21E, private parties may seek to recover response costs from any "person" "liable for [the] release or threat of release [of oil or hazardous material]," G. L. c. 21E, § 4, or property damages from "the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material,"[9] *id.* at § 5 (*a*) (1). An "[o]wner" or "[o]perator" of a site is defined as "any *person* owning or operating such site" (emphasis added). *Id.* at § 2. The term "[p]erson" is defined as "any agency or political subdivision of the federal government or the commonwealth, any state, public or private corporation or authority, any

---

[8]Under G. L. c. 258, § 2, "[p]ublic employers," "shall be liable for injury or loss of property . . . caused by the negligent or wrongful act or omission of any public employee while acting within the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances, except that public employers . . . shall not be liable for . . . any amount in excess of one hundred thousand dollars." Section 2 of G. L. c. 258, also establishes immunity for "public employee[s]" "caused by [the employee's] negligent or wrongful act or omission [committed] within the scope of . . . employment." The terms "[p]ublic employer" and "[p]ublic employee" are defined in § 1 of G. L. c. 258. There is no dispute that the MDC falls within the definition of "[p]ublic employer" under G. L. c. 258.

[9]The terms "[s]ite" and "[r]elease" are defined in § 2 of G. L. c. 21E, and are not relevant to the dispute.

interstate body, foreign nation, individual, trust, firm, joint stock company, partnership, association or other entity, and any officer, employee, or agent of such person, and any group of persons." *Id.* In keeping with the unambiguous terms of G. L. c. 21E, the MDC, an agency of the Commonwealth, cannot reasonably contend that G. L. c. 21E does not subject it to liability to private parties.

The MDC asserts that, while "[G. L. c. 258's] immunities do not apply to [c.] 21E enforcement actions *by* the Commonwealth against [S]tate agencies . . . whether the Commonwealth seeks injunctive relief, cost recovery, or natural resource damages," G. L. c. 258 limits "the extent of availability of damages to private parties in [c.] 21E actions" against it (emphasis in original). In support of this contention, the MDC relies on language, italicized below, contained in a 1992 revision of the definition of "owner" or "operator" in G. L. c. 21E, § 2. That amendment provides, in pertinent part:

> "The term ['owner' or 'operator'] shall not include the commonwealth to the extent the commonwealth holds or held any right, title, or interest in a site or vessel solely for the purpose of implementing or enforcing the commonwealth's rights or responsibilities pursuant to this chapter, unless the commonwealth caused or contributed to the release or threat of release; *provided, that nothing in this definition or in this chapter shall be construed to waive any immunity that public employers or public employees may have pursuant to chapter two hundred fifty-eight*" (emphasis added).

St. 1992, c. 133, § 274. The MDC argues that the judge erroneously denied its motion to dismiss by narrowly construing the proviso to afford "only the Commonwealth (and no other public employer) the protection of those immunities in a [c.] 21E litigation, and only in the limited circumstances when a [S]tate enforcement agency takes over the cleanup of a contaminated site." The MDC maintains that "[h]ad the Legislature intended the proviso to afford [G. L. c. 258's] immunities only to the Commonwealth, and only in the limited circumstances involving a [S]tate enforcement agency cleanup, it would have consistently used the word 'Commonwealth' in its singular form throughout that sentence."

The MDC reads the proviso in a vacuum. The relevant part of the 1992 amendment, as recognized by the judge, addressed the particular problem of "parties trying to make the [S]tate's environmental enforcement agencies strictly liable based solely on the fact that those agencies had taken over or operated a site's cleanup activities." To interpret the proviso in reference to this problem or situation, as identified in the language preceding the semi-colon, comports with both G. L. c. 258, and G. L. c. 21E. Liability of public employers under G. L. c. 258, although limited, is imposed in connection with tortious conduct, that is, negligent or wrongful acts or omissions. G. L. c. 258, § 2. Pursuant to the relevant part of the amendment, it is only when the Commonwealth takes over a site for enforcement or cleanup purposes *and* causes or contributes to a release or threat of release, that the Commonwealth may be subjected to liability and may receive the benefit of having its liability limited. To extend this limited liability to situations such as the one presented here, or in all private actions under G. L. c. 21E against public agencies or entities, would defeat one of the primary features of G. L. c. 21E (which was enacted five years after G. L. c. 258), namely the imposition of liability without regard to fault. This in turn would frustrate the purpose of G. L. c. 21E, "to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." *Taygeta Corp.* v. *Varian Assocs., Inc.*, 436 Mass. 217, 223 (2002). As correctly noted by the judge, "[i]f the intent of the 1992 amendments was to relieve all public employers of the strict liability they faced under G. L. c. 21E and impose on them only the liability they faced under G. L. c. 258, one would have expected the [L]egislature to address that problem directly in the definition of 'person,' not in [a] proviso attached to a subsection defining only 'owner or operator.' " The judge's construction is further supported by the absence of any legislative history suggesting "that the imposition of G. L. c. 21E liability on public entities was considered a problem at the time the [1992] amendment was passed." As explained by the judge, and noted below, adoption of the MDC's position would present numerous problems concerning what

procedures to follow.[10] Further, as noted below, the judge correctly demonstrated how applying the immunities in G. L. c. 258 "would be virtually unworkable."[11]

[10]"If G. L. c. 258 must be satisfied in order to bring a G. L. c. 21E claim against a public employer, a host of obstacles and definitional problems emerge. For example, how does one square the presentment requirement of G. L. c. 258, § 4 with the notification, response and conference requirements of G. L. c. 21E, § 4A? The contents of the required notices are different, the time frames are different, and the obligations of the public employer recipient are different. The statutes of limitations operate differently, with a far more complex analysis as to what starts the time running on a G. L. c. 21E claim. See G. L. c. 21E, § 11A (2) and (4). MDC avoids these problems by saying that it is only the § 10 'immunities' and the $100,000 cap on liability that protect a public employer in a G. L. c. 21E, § 5 case, not the G. L. c. 258 procedural requirements. Nowhere is this distinction set forth in G. L. c. 21E or in G. L. c. 258. One routinely characterizes the public employer as 'immune' from suit if the G. L. c. 258 presentment requirements have not been met — how are those presentment requirements not part of the 'immunities' that protect the public employer?"

[11]"[I]n this case, [A & P] prevailed against the MDC simply by proving that the oil on its property came from the MDC's property. [A & P] did not have to prove (and did not attempt to prove) how that oil had gotten onto the MDC's property in the first place. The MDC had argued that the oil had not come from its property at all, and it never sought to show (indeed it firmly denied) that the source of the oil was an Exxon pipeline that ran through the MDC property. Now, as it seeks to invoke the exception in § 10 (j), the MDC argues that it cannot be held liable for 'the harmful consequences of a condition or situation' which was caused by Exxon, and it seeks to invoke the exception in § 10 (e) because it cannot be sued for its 'issuance' of or 'refusal to revoke' Exxon's 'permit' or 'authorization' to use the pipeline. By inference one could conclude that the Exxon pipeline was the source (as no other source on the MDC property was identified), but the trial record is void of any information as to how any leak or spill from that pipeline occurred, let alone whose conduct caused that leak or spill or what that conduct consisted of. One would have to hold a second trial to ascertain precisely how the leak occurred, identify what conduct of the MDC (if any) caused or contributed to that leak, then decide whether that MDC conduct came within any of the G. L. c. 258, § 10 exceptions.

"As this case illustrates, the very facts that are necessary to determine the applicability of § 10 exceptions will often not be at issue in a G. L. c. 21E, § 5 claim. The § 10 exceptions are largely based on an assessment of what the public employer *did*, from which one then determines whether that action involved a discretionary function, a failure to prevent harmful consequences of a condition caused by someone else, a failure to inspect, etc. By contrast, a G. L. c. 21E, § 5 claim is rarely based on what the public entity did. It can be, as in the present case, premised solely on where the public entity's property was and whether the hazardous material [or oil] came from the public entity's property onto the plaintiff's property."

We thus agree with the judge that "[i]f the [L]egislature actually intended to mesh G. L. c. 258 with G. L. c. 21E for all environmental cases involving public agencies and public entities, it needed to do a lot more than simply refine the definition of 'owner or operator' in G. L. c. 21E, § 2." Rather, G. L. c. 258, and G. L. c. 21E, were intended to be interpreted as separate waivers of sovereign immunity, concerning distinct categories of claims, with separate rights and procedures. The MDC's motion to dismiss was properly denied.

2. Because A & P did not satisfy the burden placed on it by the judge's unobjected-to instructions of proving that the oil contamination on its property was not "reasonably curable by repairs or remediation," we conclude that the judge correctly allowed in part the defendants' motions for judgment n.o.v. by vacating the portion of the jury's verdict awarding A & P $2.4 million for diminution in the fair market value of its property. That the defendants did not object to the special verdict on inconsistency grounds is not of consequence because, in their motions, the defendants argued that the jury's finding that A & P's property was not reasonably curable lacked a basis in the evidence.

We begin our analysis with the judge's instructions to the jury on the issue of property damage under G. L. c. 21E. The parties did not object to these instructions, and A & P characterizes them as "proper and appropriate." The judge explained:

> "[T]he general rule would be that the measure of damage to a plaintiff's property is the amount by which its fair market value has been decreased, has been diminished, has been reduced because of the contamination on the property
>
> . . . . However, if the damage to the plaintiff's property can reasonably be cured, can reasonably be repaired, remediated, then the plaintiff, instead, gets the expense of doing those repairs, of doing that remediation.
>
> "That will be true as long as the costs to do those repairs, to do that remediation, are less than the decrease in fair market value, and if those repairs would reasonably — what we call reasonably cure the damage."

After providing some examples to the jury of those principles,

the judge stated, "if the property cannot be remedied, cannot be repaired, if it is not reasonably curable . . . then the plaintiff would get the decrease in fair market value." As to the definition of "reasonably curable," the judge told the jury that the term "means that the property may be repaired at a reasonable cost, with reasonable certainty, within a reasonable period of time. . . . Sometimes people refer to this concept by using the terms temporary damage as opposed to permanent damage. In this context, the term temporary would refer to damage that is reasonably curable. Permanent would refer to damage that is not reasonably curable." The judge went on to explain:

> "In this context the term temporary doesn't refer to fleeting. And the term permanent does not mean perpetual, in eternity. It is a different terminology, again, used to convey the same concept of reasonably curable. Something that is reasonably curable is referred to as temporary damage, meaning it can be repaired at a reasonable cost, with reasonable certainty, within a reasonable period of time."

The judge instructed the jury to consider various factors in determining whether the property damage was reasonably curable:

> "Those [factors] would include the nature of the pollution, the nature of the contamination; whether techniques, technology are available to clean it up; whether the contamination is still ongoing at the time of trial; how long it has existed as of the time of trial; whether the pollution will continue for an unpredictable time in the absence of remedial action.

> "As I say, whether the property can be fully restored to its prior pre-release, that is, pre-contamination condition, within a reasonable period of time, through a reasonable expenditure of money; whether the pollution has caused some irreplaceable loss during the time that it has existed on the property; whether the repair, the remediation is not feasible because of factors beyond the plaintiff's control, you consider all these factors, all the evidence that you have heard about this particular contamination, and you decide: is this damage reasonably curable, or is it not reasonably curable."

Finally, the judge instructed the jury that the burden of proof fell on A & P to prove, by a preponderance of the evidence, that its property was not reasonably curable. The judge appears to have drawn her instructions from cases such as *Trinity Church in the City of Boston* v. *John Hancock Mut. Life Ins. Co.*, 399 Mass. 43, 50 (1987), and cases cited, and *Black* v. *Coastal Oil New England, Inc.*, 45 Mass. App. Ct. 461, 465-466 (1998), and cases cited. The unobjected-to instructions became the law of the case. *Gendreau* v. *C.K. Smith & Co.*, 22 Mass. App. Ct. 989, 990 (1986), and cases cited. As far as relevant, the significant point in the instructions is the *limit* of recovery solely to remediation costs where the effect of contamination is reasonably curable.

Our concern is with the lack of any evidence from A & P demonstrating that the contamination to the property was not reasonably curable or remediable. A & P's expert witness on this subject was Richard Wozmak, a hydrogeologist, engineer, and licensed site professional in Massachusetts. Wozmak testified that the contamination on A & P's property could be remediated at a cost of approximately $500,000 by pumping the oil and contaminated groundwater out of the ground, thereby lowering the water table and enabling the removal of the contaminated soil, which then would be disposed of off site at a proper disposal facility. Wozmak testified that this cleanup would be "useless" unless (1) there was remediation of MDC's property, and possibly Creative's property, to prevent recontamination of A & P's property due to the manner in which the oil was migrating; or (2) the release of oil from the adjacent properties was "cut off." As to the latter option, Wozmak explained that "interceptor trenches" could be placed along the property boundaries to collect contaminated oil or groundwater, which would then be pumped out. These options, and the costs associated with them, were not included in Wozmak's remediation plan. During cross-examination, Wozmak made clear that complete remediation was possible.

A & P argues that the judge "incorrectly found that the 'undisputed evidence' is that the contamination on the A & P [p]roperty is 'reasonably curable by repairs,' " and that the judge's conclusion that the property could be remediated for

$500,000 "is contrary to the evidence and undisputed expert testimony," namely Wozmak's testimony. A & P also alleges that the judge improperly usurped the jury's fact-finding role. These arguments miss the mark. What A & P overlooks is that the burden was on it to prove damages, and as explained by the judge in her instructions to the jury, which were not objected to, this burden included proving that A & P's property was not reasonably curable or remediable.[12] Quite simply, A & P failed to satisfy this burden. While A & P, through Wozmak, conceded that complete remediation was possible by using interceptor trenches,[13] A & P did not offer evidence on the cost feasibility of this option. Nor did A & P offer evidence on whether this option would cure the contamination with reasonable certainty and within a reasonable amount of time. A & P concedes as much in its reply brief: "the cost of the installation of these devices [interceptor trenches] explicitly was not included in the remedial cost estimate, and . . . the feasibility of installing these structures without interfering with the current use of the [p]roperty has not been evaluated." The judge correctly recognized A & P's failure. As she stated in her memorandum on the defendants' motions for judgment n.o.v.: "There was no evidence that [use of interceptor trenches] would not work or that its costs would exceed the $2.4 million value of the A & P property." Thus, "taking into account all the evidence in [the] aspect most favorable to the plaintiff," as we must, *McNamara v. Honeyman*, 406 Mass. 43, 45 (1989), quoting *Tosti v. Ayik*, 394 Mass. 482, 494 (1985), there was no evidence introduced by A & P on which the jury could base a finding that A & P's property was not reasonably curable. A & P's evidence that the property could not be sold does not bear on whether the property was or was not reasonably curable. Further, A & P's assertion that the interceptor trenches would not reasonably cure its

---

[12]Having not objected to these instructions concerning its burden of proof, A & P cannot now claim that the judge "inappropriately placed the burden on [it] to prove that interception of the migration of contamination from the MDC site was not feasible to support any claim that cleanup on the A & P site was not feasible." *Gendreau v. C.K. Smith & Co.*, 22 Mass. App. Ct. 989, 990 (1986), and cases cited.

[13]There was no testimony at trial concerning where, that is, on whose property, the interceptor trenches could be placed.

property because they would require "constant and indeterminately long operation and maintenance," is not supported by any evidence and is a fact A & P had the burden to show by expert testimony. The conclusion that A & P has failed in its burden of proof is dictated by the evidence presented.

The judge's suspicion that A & P was attempting "to bolster its $2.4 million claim for 'property damage,' " is also warranted. To permit A & P to avoid establishing that its property was not reasonably curable so that it may recover a greater amount of damages (the diminution of the property's fair market value) results in an inappropriate windfall to A & P. Such a recovery would also contravene "the general requirement [applicable in property damage cases] that a party seeking damages take reasonable action to limit or mitigate damages." *Guaranty-First Trust Co.* v. *Textron, Inc.,* 416 Mass. 332, 337 (1993).

3. Review of the judge's order denying A & P's posttrial motion for attorney's and expert witness fees pursuant to G. L. c. 21E, §§ 4A (*d*) (2) & (3), and 15, raises different facts and issues with respect to the two separate statutory provisions authorizing such fees. Accordingly, we separately address A & P's arguments in connection with the applicable statutory provision.

(a) A & P contends that it should have been able to recover its expert witness and attorney's fees under G. L. c. 21E, § 4A (*d*) (2) & (3),[14] from the MDC because the MDC refused to participate in the presuit § 4A process thereby demonstrating "bad faith and purposeful neglect of statutory requirements." The judge rejected this argument after assessing documentary

---

[14]Section 4A (*d*) of G. L. c. 21E provides, in pertinent part:

"[T]he court shall award the plaintiff its litigation costs and reasonable attorneys' fees if the plaintiff shows, and the court finds, that the person against whom the civil action is brought is liable and . . . (2) did not participate in negotiations or dispute resolution in good faith, or (3) failed without reasonable basis to enter into or carry out an agreement to perform or participate in the performance of the response action on an equitable basis or pay its equitable share of the costs of such response action or of other liability pursuant to the provisions of this chapter, where its liability was reasonably clear."

and testimonial evidence offered by A & P, concluding that, "[t]here [was] absolutely no evidence of 'bad faith.' " The judge explained: "MDC itself was subject to certain technical requirements concerning its own response, and it appropriately protected itself by explaining that its own less than technically correct response was due at least in part to A & P's less technically correct notice." Nor had A & P, during the relevant time frame, established the MDC's liability with reasonable clarity, as "[a]ll that A & P had presented . . . was that contamination had been found on both properties and that groundwater flow analyses to date were inconclusive." The judge's conclusions are supported by the evidence and are based on credibility determinations within her province. We affirm that portion of the judge's order denying A & P's motion for fees under § 4A (*d*).

(b) We also conclude that the judge did not abuse her discretion in denying A & P's motion for expert and attorney's fees under G. L. c. 21E, § 15, set forth below,[15] from both defendants. An award under § 15 is not automatic simply because a prevailing plaintiff established that it advanced the purposes of G. L. c. 21E. Contrary to A & P's assertion, the judge expressly credited A & P's claim that it had advanced G. L. c. 21E's purposes to some extent. With respect to Creative, which prior to trial (and at trial) admitted that some of the oil had come from its property, and had early in the dispute made a reasonable settlement offer (which turned out to be not significantly less than its share of liability), the judge found that litigation against Creative "did not accomplish anything," and that A & P's request for fees against Creative was meritless. With respect to the MDC, the judge found that A & P "deliberately and for no good reason breached the parties' . . . agreement to mediate this entire dispute," with the likely effect

---

[15]General Laws c. 21E, § 15, provides:

"In any suit by Massachusetts residents to enforce the requirements of this chapter, or to abate a hazard related to oil or hazardous materials in the environment, the court may award costs, including reasonable attorney and expert witness fees, to any party other than the commonwealth who advances the purposes of this chapter."

of postponing "the ultimate cleanup of this property by a matter of many years beyond the date it would otherwise have occurred," thus "flout[ing] the spirit" of G. L. c. 21E. The judge noted that A & P's conduct would have permitted the MDC to seek fees against A & P under G. L. c. 21E, § 4A (*f*),[16] and, therefore concluded that any fees she would have otherwise awarded to A & P would be offset by an award under § 4A (*f*). The judge carefully considered the matter and made credibility determinations to which we are bound.

We reject A & P's contention that the judge's conclusions were "unfounded" and "unsupported" by evidence. In addition to the evidence at trial, Creative presented an affidavit at the hearing on A & P's motion for fees to support its contention concerning its pretrial settlement offer to A & P as documentary evidence concerning the parties' agreement to mediate and A & P's withdrawal from that agreement. The affidavit had been appended to the MDC's opposition to A & P's motion for fees. Creative also indicated that there was a witness prepared to testify and be cross-examined. The judge made it clear that she would take evidence on the issues concerning A & P's request for fees, and gave A & P an opportunity to present evidence on the issues, which A & P did not do (apart from the witnesses it offered on the § 4A [*d*] aspect of fees). The record indicates that the judge considered A & P's arguments concerning the futility of mediation and its reasons for withdrawing from its agreement to mediate. A & P's arguments on appeal are not supported in the record and are unconvincing. Because there was no abuse of discretion, we affirm the judge's order denying A & P's request for fees under § 15.

4. The orders denying MDC's posttrial motion to dismiss the G. L. c. 21E claim, and A & P's posttrial motion for attorney's and expert witness fees under G. L. c. 21E, are affirmed. The order allowing in part MDC's and Creative's motions for judg-

---

[16]General Laws c. 21E, § 4A (*f*), provides:

"If the court finds that . . . the plaintiff did not participate in negotiations or dispute resolution in good faith . . . it shall award litigation costs and reasonable attorneys' fees to the defendant."

ment n.o.v., by vacating the portion of the jury's verdict award-
ing A & P $2.4 million in property damage, is affirmed. The
judgment is affirmed.

*So ordered.*