Gants, Ralph D., J.
The plaintiff, Danvers-DCH, Inc. (“Danvers” or “Tenant”), leases property in Medford owned by the defendant Kathleen Hill, as Trustee of the A&P Realty Trust (“Hill” or “Landlord”). The crux of the dispute is whether Danvers may exercise its option to purchase the property under the Amended Lease. Both parties have cross moved for summary judgment. Since Danvers obtained a lis pendens from this Court on July 26, 2005, Hill has also brought a special motion to dismiss under G.L.c. 184, §15. This Court will address the cross motions for summary judgment first.

*338
CROSS MOTIONS FOR SUMMARY JUDGMENT Background

The facts are not materially in dispute. On March 15, 1993, the Landlord and a former tenant, Viper Holding Corporation (“Viper”), entered into a ten-year Lease concerning a building and roughly 79,000 square feet of land located at 100-104 Mystic Avenue in Medford. On December 20, 1999, Viper, with the Landlord’s approval, assigned the Lease to Danvers and certain amendments were agreed to as to the Lease (“the Amended Lease”). Under the Amended Lease, the original term of the Lease was five years, beginning on December 20, 1999, and the Tenant, if not in default, had the right to extend the term of the Amended Lease for two additional periods of five years each. Amended Lease at §2.3. The Amended Lease also provided:
Tenant, if not then in default hereunder, shall have the option to purchase the Premises during the first six (6) months of the first extended term, and during the first six (6) months of the second extended term provided that the Original Term has been properly extended (collectively “the Option Period(s)”), for the following purchase prices: (i) the purchase price for the Premises in the first Option Period shall be [$2,900,000] and (ii) the purchase price for the Premises in the second Option Period shall be [$3,500,000].
Id. at §9.7.
The parties to the Amended Lease specifically acknowledged that, when the Original Lease was executed in 1993, “oil had been found in the groundwater on certain portions of the Premises and that it presently appears that the source of such oil is from an off-premises site as to which neither Landlord nor Tenant bear responsibility.” Id. at §5.2.3. In fact, the Landlord had spent a substantial sum of money to remediate the environmental damage to the property-caused by the migration of at least 90,000 gallons onto the property, and filed suit in 1995 under the Massachusetts Oil and Hazardous Material Release Prevention Act, G.L.c. 2IE, to obtain reimbursement of its response costs. On February 5, 2001, after trial and post-trial motions, the Landlord was awarded a final judgment of $239,904.77 in reimbursement of past response costs and $500,000 for the cost of future clean-up of the property. The judgment was affirmed by the Supreme Judicial Court in 2003. Hill v. Metropolitan District Commission, 439 Mass. 266 (2003). Of the $500,000 awarded for future clean-up, $250,000 was held in escrow, to be released with interest to the Landlord at the earlier of (a) verification by a licensed site professional that a Response Action Outcome Report has been filed with the Department of Environmental Protection (“DEP”) or (b) March 3, 2007. Dan-vers was aware of the environmental damage that had been done to the property, the remediation efforts, and the litigation surrounding it.
Beginning in December 2003 and continuing through 2005, the Department of Conservation and Recreation (“DCR”) performed an environmental evaluation of the abutting property, including soil and groundwater testing, as part of its preparation of a Phase II site assessment. Danvers was aware of DCR’s environmental evaluation.
The Amended Lease did not revise the negative covenants binding the Tenant during the lease term. Among those negative covenants are detailed environmental obligations imposed upon the Tenant. One of those environmental obligations states as follows:
Tenant agrees to deliver promptly to Landlord any notices, orders or similar documents received from any governmental agency or official concerning any violation of any Environmental Laws or with respect to any hazardous materials affecting the Premises.
Id. at §5.2.3. The term “hazardous materials” is defined in the Amended Lease to “mean and include any oils, petroleum products, asbestos, and any other toxic or hazardous wastes, materials and substances which are defined, determined or identified as such in any Environmental Laws ...” Id
The Amended Lease also provides that the Tenant shall not make “any improvements, alterations, installments, changes or additions (collectively, ‘Tenant Improvements’)” except in accordance with the terms specified in the Amended Lease. Id at §5.1.5(i). Among those terms are the following:
Prior to the commencement of work on any Tenant Improvement, Tenant shall have, in each case:
w. obtained Landlord’s prior written consent and approval of the plans and specifications therefor, which consent shall not be unreasonably withheld, provided Tenant shall have complied with all the requirements of this Section 5.1.5; . . .
y. obtained all necessary permits and approvals for such work . . .
Id. at §5.1.5(iii).
Danvers operated an automobile dealership on the property, known as Ira Dodge. On March 1, 2004, DEP issued a formal written Notice of Noncompliance to the Tenant based on its January 30, 2004 inspection of the premises, citing eleven environmental violations. Among the violations cited was that wastewater contaminated with oily sludge had been illegally disposed of through an improperly maintained oil/water separator, that waste oil tanks and containers had been left open, and that the Tenant had failed to register with the Environmental Protection Administration as a large quantity generator of waste oil and obtain an EPA Generator Identification Number. Despite its obligation under the Amended Lease to “deliver promptly” such notices of environmental violations, Danvers failed to deliver the Notice of Noncompliance to the Landlord or otherwise advise the Landlord of the *339 receipt of the Notice. The Landlord did not learn of the receipt of this Notice until April 2005, when its engineer inspected the property.
In October 2003, the roof of Danvers’ automobile showroom was leaking heavily, causing damage to the interior of the building and its contents. Upon inspection, it emerged that the source of the leaks was a Spire on the roof. On November 5, 2003, Danvers’ Chief Financial Officer notified the Landlord in writing that, to repair the leaks, the entire roof and Spire needed to be removed and the area sealed watertight, and the Landlord gave verbal approval to these repairs. Dan-vers, at its own expense, retained an architect and a roofing contractor to conduct the roof repairs. On November 18, 2003, the Landlord spoke with Danvers’ Chief Financial Officer, told him of the importance the Landlord gave to the return of the Spire, and requested that it be restored when the roofing work was completed. Danvers agreed to take steps to restore the Spire. When the repairs were concluded, however, the copper-domed Spire was not put back on the roof. On May 17, 2004, the Landlord sent Danvers a letter complaining about Danvers’ failure to restore the Spire, noting that failure to so would “negatively impact the value of the site,” because the Spire offered a “heightened profile to the site, ” since it had been visible from Route 93.
On June 15,2004, the Landlord’s attorney provided written notice to Danvers that it was in default of the Amended Lease for failure to restore the Spire, and directed Danvers to cure the default within 30 days. There is no dispute that the Spire has yet to be restored. There is also no dispute that Danvers never obtained the required permit from the City of Medford to perform the roof replacement.
The Landlord’s June 15, 2004 letter declaring Dan-vers in default ended with the following reminder, “You are reminded that if the Tenant wishes to extend the current term of the Lease, such extension must be exercised not later than June 20, 2004 (in which event annual rent will increase to $232,000).” On June 17, 2004, the Tenant exercised its option to extend the Amended Lease for five years, with the lease extension period commencing on December 20, 2004. In acknowledging the extension in a letter dated June 24, 2004, the Landlord’s attorney specifically noted that the Tenant’s right to extend the lease period was subject to the Tenant not being in default under the Lease. The letter stated, “Please understand that the Landlord’s acceptance of the Tenant’s exercise of its extension option is not to be construed as a waiver of the Landlord’s assertion that a default currently exists under the Lease as set forth in the notice of default that I sent to you on June 15, 2004.”
On December 23, 2004, just three days into the lease extension period, Danvers notified the Landlord that it wished to assign its interest in the Amended Lease to Lawrence Gordon as part of an Asset Purchase Agreement dated August 30, 2004. On May 9, 2005, Danvers attempted to exercise its option to purchase the property under the Amended Lease by tendering the purchase price of $2.9 million and setting a closing date for the purchase of June 15, 2005. There is no dispute that the attempt to exercise the option to purchase was timely, since it was made within the first six months of the lease extension, and that the Landlord was obliged to sell the property to the Tenant pursuant to this option if the Tenant was not in default.
On May 23, 2005, Landlord’s attorney acknowledged receipt of the Tenant’s May 9 letter but notified the Tenant that it was in default for failing to notify the Landlord of the citations the Tenant had received from DEP, for failing to replace the Spire, and for replacing the roof without a permit. On June 14, 2005, the Landlord, through counsel, orally refused to sell the property to the Tenant under the option to purchase because of the various defaults.

Discussion

There can be no dispute that, when Danvers sought to exercise its option to buy, it was in default under the Amended Lease on at least three grounds:
1. It had failed to provide timely notice of its receipt of the DEP Notice of Noncompliance, in violation of §5.2.3 of the Amended Lease;[1]
2. It had failed to replace the Spire, without obtaining the Landlord’s consent for the permanent removal of the Spire, in violation of §5.1.5(w); and
3. It had failed to obtain a permit before conducting the roofing work, in violation of §.5.1.5(y).
Controlling Massachusetts appellate authority makes clear that an option to purchase property that is expressly conditioned on the absence of any default may not be specifically enforced in the presence of a default. Pear v. Davenport, 67 Mass.App.Ct. 239 (2006). As the Appeals Court earlier said in Westinghouse Broadcasting Co., Inc. v. New England Patriots Football Club, Inc.:
Generally, conditions for the exercise of an option require a more strict degree of adherence than may be the case in provisions of a bilateral contract. United States v. Corder, 208 F.2d 411, 413 (9th Cir. 1953). 1 Williston, Contracts s 61D (3d ed. 1957). 1A Corbin, Contracts s 264, at 522-523 (1963). The rationale for the lesser inclination of courts to inquire into the materiality of a breach of an option condition is that an optionee has a unilateral right. See e. g., Lucey v. Hero Intl. Corp., 361 Mass. 569, 573-74 (1972). He may choose to compel or not to compel the option or to a course of performance which intervening facts (e. g., an increase in the value of the optioned rights) may have made unpalatable to the latter. In the circumstances it may not be too much to ask that a person seeking to *340 keep alive and to exercise option rights turn his comers squarely.
10 Mass.App.Ct. 70, 73 (1980), quoted in Pear v. Davenport, 67 Mass.App.Ct. at 244.
Nor, for three reasons, can the Landlord’s waiver of the default for the lease extension be constmed as a waiver of the default for the option to buy. First, the Landlord, in accepting the Tenant’s lease extension in its letter of June 24, 2004, expressly made clear that its acceptance “is not to be constmed as a waiver of the Landlord’s assertion that a default currently exists under the Lease . . .” Moreover, the Amended Lease itself provided.
Any consent or permission by Landlord to any act or omission which otherwise would be a breach of any covenant or condition hereof, shall not in any way be held or construed (unless expressly so declared) to operate so as to impair the continuing obligation of any covenant or condition herein, or otherwise, except as to the specific instance, operate to permit similar acts or omissions.
Amended Lease at §7.5. Consequently, both the specific waiver itself and the Amended Lease make clear that the waiver of the default for the purpose of allowing extension of the Lease did not waive the default for any other purpose.
Second, when the Landlord on June 24, 2004 waived the default as to the Spire for the purpose of allowing extension of the Lease, it did not even know of perhaps the most consequential act of default — the issuance by DEP of a Notice of Noncompliance with environmental laws on March 1, 2004. The Landlord cannot reasonably be held to have waived a default it had not learned of from the Tenant, especially when the default itself was the failure of the Tenant to provide the Landlord with notice of the environmental violations.
Third, controlling Massachusetts authority expressly declares that “a waiver of the conditions with respect to the tenancy will not be a waiver of the conditions for the option [to purchase] unless the lessor makes a separate waiver of those conditions.” Pear v. Davenport, 67 Mass.App.Ct. at 243 & 245. Here, there is no evidence of any separate waiver as to the option to purchase.
Since the Landlord had no contractual obligation to agree to the Tenant’s exercise of the option to purchase the property because of the defaults, it is of no legal consequence why the Landlord chose not to waive those defaults. For purposes of this motion, this Court will accept Danvers’ contention that the Landlord recognized that the property’s fair market value was substantially greater than the option price and refused to waive the defaults for that reason. In the absence of any contractual obligation because of the failure of a condition precedent, the Landlord’s motive for not waiving the condition precedent is utterly irrelevant.
Therefore, for the reasons stated above, this Court allows the Landlord’s motion for summary judgment and denies the Tenant’s motion for summary judgment.

HILL’S SPECIAL MOTION TO DISMISS UNDER G.L.c. 184, §15

UnderG.L.c. 184, §15, if a plaintiff, as here, obtains an ex parte memorandum for lis pendens, the defendant may file a special motion to dismiss. The statute provides:
The special motion to dismiss shall be granted if the court finds that the action or claim is frivolous because (1) it is devoid of any reasonable factual support: or (2) it is devoid of any arguable basis in law; or (3) the action or claim is subject to dismissal based on a valid legal defense such as the statute of frauds. In ruling on the special motion to dismiss the court shall consider verified pleadings and affidavits, if any, meeting the requirements of the Massachusetts rules of civil procedure.
G.L.c. 184, § 15(c).
There is virtually no appellate guidance as to the interpretation of these statutory terms. In the only published appellate case that considers a special motion to dismiss, the Appeals Court, in affirming the trial court’s allowance of the special motion to dismiss, focused primarily on the omission of material facts from the verified complaint, which it noted was contrary to the certification required under G.L.c. 184, § 15(b) in which the affiant must affirm that “no material facts have been omitted therefrom.” Galipault v. Wash Rock Investments, LLC, 65 Mass.App.Ct. 73, 82-84 (2005). That precedent, by itself, is sufficient here to allow the special motion to dismiss because Danvers’ verified complaint, while it noted that DEP had issued a Notice of Noncompliance to Danvers on March 1, 2004, omitted the fact that Danvers had failed to furnish this Notice to the Landlord, as required under Section 5.2.3 of the Amended Lease. This omission was magnified in the July 19, 2005 affidavit of David Rosenberg, Danvers’ President, that was furnished to the Court in support of Danvers’ motion for lis pendens. In that affidavit, Rosenberg attested.
In a letter dated June 15, 2004, the Defendant notified the Plaintiff that it was in default under the lease. Neither at the time of such notification, nor at any time thereafter, has the Plaintiff ever been in default under the lease. The Plaintiff has fulfilled, and continues to fulfill, all of its obligations pursuant to the provisions of the lease.
This assertion was plainly in error, because there can be no doubt that, as of June 15, 2004, Danvers had received the DEP Notice of Noncompliance and had failed to furnish it to the Landlord, and Rosenberg knew or should have known of this crystal clear default.
*341 Wholly apart from the omission in the verified complaint and the misrepresentation in Rosenberg’s affidavit, this Court also finds that Danvers’ claim for specific performance was frivolous because it was devoid of any reasonable factual support or arguable basis in law. This Court recognizes that the dictionary definition of “devoid,” is “completely without; empty or destitute.” Webster’s New World Dictionary, 3rd ed. (1988). Therefore, if there were any reasonable factual support for Danvers’ contention that it was not in default or any arguable basis in law for Danvers’ contention that its default had been waived or was so immaterial that it did not bar its exercise of the option to purchase, then the special motion to dismiss must not be granted.
Here, however, it should have been absolutely clear to Danvers that its failure to furnish the Landlord promptly with the DEP Notice of Noncompliance constituted a default. It should have been equally clear that, under the terms of the Amended Lease and the controlling Massachusetts caselaw, the presence of such a default would bar judicial enforcement of its option to purchase. Its waiver claim could not possibly prevail as to the environmental default, because the Landlord did not know of the DEP Notice (because Danvers had failed to tell the Landlord about it) when the Landlord waived Danvers’ defaults to allow the extension of the lease period. Nor, for two reasons, can Danvers defeat this motion to dismiss by contending that it understood the alleged defaults to be immaterial. First, in view of the environmental history of this property and the significance of the environmental violations identified in the Notice of Noncompliance, it was not reasonable to believe that the failure to inform the Landlord of the DEP notice did not constitute a material default. Second, it was plain from the controlling case law when the motion for lis pendens was brought[2] that, when the absence of a default is a condition precedent for the exercise of the option to buy, the default, at a minimum, need satisfy a lower threshold of materiality to defeat the option to buy. Westinghouse Broadcasting Co., Inc. v. New England Patriots Football Club, Inc., 10 Mass.App.Ct. at 73.
For these reasons, this Court allows the defendant’s special motion to dismiss. Under G.L.c. 184, § 15(c), by allowing the motion to dismiss, this Court must award the defendant its costs, including its reasonable attorneys fees, incurred for the special motion to dismiss and related discoveiy.[3] If the defendant seeks such an award, it shall serve its application for attorneys fees and costs on plaintiffs counsel no later than April 13, 2007. A hearing shall be conducted on May 17, 2007 at 2 p.m. with respect to this application.

ORDER

For the reasons stated above, this Court ORDERS as follows;
1. As to the cross motions for summary judgment, the defendant Hill’s motion for summary judgment is ALLOWED and the plaintiff Danvers’ motion for summary judgment is DENIED.
2. The defendant’s special motion to dismiss under G.L.c. 184, §15 is ALLOWED. If the defendant seeks an award of its costs, including its reasonable attorneys fees, incurred for the special motion to dismiss and related discovery, it shall serve its application for attorneys fees and costs on plaintiffs counsel no later than April 13, 2007. A hearing shall be conducted on May 17,2007 at 2 p.m. with respect to this application.

Danvers almost certainly was also in violation of the provisions of the Amended Lease requiting compliance with the environmental laws, but this Court does not find the Notice of Noncompliance sufficient alone to establish such violations.

This Court recognizes that Pear v. Davenport had not been decided when the motion was filed and decided. Pear was not decided until August 30, 2006, more than ayear after the allowance of the motion for lis pendens.

The Landlord is not entitled to recover its costs for the preparation of the motion for summary judgment.