NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-750

JACQUELINE ELECTRIC & CONTRACTING, INC.

vs.

DAVID TETREAULT[1] & others.[2]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The plaintiff, Jacqueline Electric & Contracting, Inc.

(JEC), brought this action seeking damages against its former

employee, David Tetreault.[3]  JEC claimed that Tetreault took

---

[1] Also known as David R. Tetreault.

[2] Santander Bank, N.A.; TD Bank, N.A.; Citi Cards, a Division of City Bank; and First Essex Bank of Lawrence as trustee process, injunctive relief, and reach and apply defendants.

[3] JEC's complaint alleged the following claims:  (1) larceny by embezzlement, pursuant to G. L. c. 266 § 30; (2) conversion; and (3) money had and received; and sought (4) a declaratory judgment; (5) an injunction preventing Tetreault from spending or transferring any of the funds at issue and reach and apply relief; and (6) real estate attachments against the bank holding the mortgage on Tetreault's home, and trustee process attachments against the bank which financed his personal credit card.

approximately two million dollars from the company without authority.  At trial, Tetreault did not dispute that he took large sums of money from JEC.  He maintained, however, that he had permission from JEC's owner and president, Jacqueline Gorman, to take the funds as compensation pursuant to an oral employment agreement.  Gorman testified that she did not authorize the payments at issue.  The jury believed Tetreault and returned a verdict in his favor.  Thereafter, JEC's motion for a new trial, motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, and motions for reconsideration were denied.  This appeal ensued.[4]

Background.  The relevant facts are as follows.  JEC is a general contracting and electrical company with a principal place of business in South Easton.  As noted, Gorman is the owner of the company.  She met Tetreault in 2014 at their local gym.  After learning that Tetreault was a disabled veteran, Gorman offered him part-time employment, which Tetreault accepted.  Tetreault began working fifteen to sixteen hours a week and was paid $13 an hour.  Initially, Tetreault's duties consisted of cleaning up jobsites and making deliveries.  As time went on, Tetreault assumed additional responsibilities, which included data entry of invoices, bills and banking

_____

[4] Tetreault, who represented himself at trial, did not enter an appearance and did not file a brief.

2

statements.  In view of these new responsibilities, Gorman orally agreed to raise Tetreault's hourly wage to $15 an hour with a weekly cap of $500 a week.  Occasionally, Gorman also permitted Tetreault to use JEC's credit card to take his wife out to dinner and gave him gift cards as bonuses.  Tetreault's responsibilities continued to increase and soon included managing JEC's books and accounts.  Ultimately, Tetreault was involved in all day-to-day operations of the company, aside from buying and bidding, and had almost full responsibility for the company's finances.[5]  According to Tetreault, Gorman orally agreed to increase his salary to compensate him for the added responsibilities and additional hours although no specific amount of compensation was discussed.

In 2016-2017, Gorman noticed discrepancies in JEC's accounting statements, and she questioned how JEC's "money started disappearing."  In March of 2021, she contacted JEC's corporate accountant, Charles Woodward, with whom she claimed to have discovered that Tetreault had altered bank statements to disguise his use of company funds to pay his personal credit card bills.  Gorman testified that she and Woodward also found that Tetreault hid these payments within JEC's job cost reports,

---

[5] Tetreault testified that he was involved in new aspects of the business and was essentially running the office, which required him to come in at 4:30 A.M. each morning.

3

which Tetreault prepared and uploaded into QuickBooks, an accounting software program.[6]  Beginning in 2020, Tetreault used as much as $40,000 a month in company funds to cover his credit card debts.[7]  By 2021, that amount had increased substantially to between $70,000 and $100,000 a month.  Gorman estimated that Tetreault had taken almost a million dollars in 2021 before she terminated his employment in August.

As previously noted, Tetreault admitted that he used company funds and claimed that he did so with Gorman's knowledge and permission.  At trial he explained how he transferred money from JEC's operating accounts to pay his credit card bills and disguised the payments as job costs.[8]  Although Tetreault acknowledged that Gorman never expressly agreed to the amount of money he could withdraw from JEC's accounts and that he never

---

[6] Woodward also had no knowledge of any agreement between Gorman and Tetreault and Tetreault testified that he did not tell Woodward about the agreement because "the agreement was between [him and Gorman]".

[7] Tetreault used his credit card to pay for gas, food, home and auto repair, and "online gaming."

[8] Tetreault testified,

"If I get a credit card statement, I would look at the amount.  I then log onto my credit card statement, make the payment.  The monies funds were transferred from JEC's operating accounts to pay that amount.  I would then credit that amount in said checkbook, so it balanced. And then I would put a matching invoice into commodities and do a job cost, so the books were balanced."

told her how much money he was taking each month, he asserted that Gorman was aware of the amounts he took because he gave her the job cost reports to review. Thus, according to Tetreault, "if there was an issue," Gorman would have "address[ed] it [with] [him]." Gorman contradicted Tetreault's claim and testified that she could not have known what Tetreault was doing by examining the job cost reports because Tetreault hid the "unauthorized" transfers by "collaps[ing] the categories" of expenses on a project instead of listing them out on the job cost reports as he had done previously.

At the close of all the evidence, JEC moved for a directed verdict. The thrust of JEC's argument was that Tetreault's testimony was so unbelievable no rational jury could accept it as true. In addition, JEC argued that the evidence did not warrant a finding that Tetreault and Gorman had entered into an enforceable employment contract because the two had never agreed on the amount of compensation to which Tetreault was entitled. The judge denied the motion, explaining that it was "the jury's role (and not the judge's)" to decide if Tetreault was telling the truth. He further concluded that "there's no doubt there was an agreement [between Gorman and Tetreault]" and the issue for the jury was whether Tetreault took more compensation than authorized under the agreement and, if so, how much. The judge then informed the parties that he would instruct the jury on a

claim of breach of the parties' employment agreement and would not instruct the jury on JEC's claims for conversion or money had and received.[9]

Thereafter, the judge instructed the jury in accordance with his ruling on the theory of liability and provided the jury with two preprinted general verdict slips: one for a verdict in favor of JEC, and one in favor of Tetreault. After deliberating for about four hours, the jury returned its verdict. The correct verdict slip ("VERDICT OF THE JURY FOR THE DEFENDANT") was signed by the foreperson and dated. In addition, the foreperson wrote "not guilty" on the verdict slip and initialed that insertion. The transcript reflects that the judge reviewed the verdict slip, stated that the additional words were not necessary, and instructed the foreperson to strike the words "not guilty." The foreperson complied, and the verdict was returned to the court clerk, who read it aloud. The verdict was then confirmed by the foreperson and all the jurors to be a true verdict.

After judgment entered, JEC filed a motion for a new trial on the ground that the judge improperly altered the jury's verdict, and a motion for judgment notwithstanding the verdict,

_____

[9] The judge also dismissed JEC's claim of embezzlement, reasoning that "[e]mbezzlement is not a cause of action. It's not a civil cause of action. It's a crime." JEC does not challenge this ruling on appeal.

6

or, in the alternative for a new trial, on the ground that the evidence did not support the verdict and the judge erred by not instructing the jury on conversion and money had and received. The judge denied both motions in two separate well-reasoned memoranda of decisions and orders.[10]

Discussion. 1. Denial of JEC's motions for a directed verdict and judgment notwithstanding the verdict. JEC argues that it was entitled to a verdict in its favor because (1) Tetreault was not credible and no reasonable jury could find that he had permission to pay himself such large sums of money; and (2) the evidence did not warrant a finding that Tetreault and Gorman had entered into an enforceable employment contract because there was no "meeting of the minds" with regard to the amount of Tetreault's compensation. I & R Mech. Inc. v. Hazelton Mfg. Co., 62 Mass. App. Ct. 452, 455 (2004), quoting Restatement (Second) of Contracts § 17 comment c (1981). We conclude that the motions were properly denied.

Review of the denial of a motion for directed verdict or judgment notwithstanding the verdict,

> "requires us to construe the evidence in the light most
> favorable to the nonmoving party [here, Tetreault] and
> disregard that favorable to the moving party [JET]. . . .
> Our duty in this regard is to evaluate whether anywhere in
> the evidence, from whatever source derived, any combination
> of circumstances could be found from which a reasonable
> inference could be made in favor of the [nonmovant]."

---

[10] JEC's motions to reconsider also were denied.

7

O'Brien v. Pearson, 449 Mass. 377, 383 (2007) (quotations omitted). As the judge correctly noted when he denied the motions, Tetreault's testimony provided sufficient factual support for a reasonable inference that Gorman gave him permission to take company funds as compensation and that he did so pursuant to an oral agreement. Even if Tetreault's testimony was highly implausible, the issue of credibility is "properly left for the jury." Lupia v. Marino, 353 Mass. 749 (1967). Here, Tetreault testified that he was authorized to withdraw funds from JEC's accounts based on the number of hours he worked, and that he was entitled to additional compensation because he was working long hours in a role with significant authority. That it may seem unlikely that Gorman would authorize the withdrawal of such large sums or that Gorman disputed Tetreault's claims at trial is inconsequential. The testimony created a factual dispute which could only be resolved upon determining Tetreault's and Gorman's credibility, a decision the judge properly left for the jury. See Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978). See also Situation Mgmt. Sys. v. Malouf, Inc., 430 Mass. 875, 879 (2000) (resolution of whether material terms were yet to be negotiated was fact question properly reserved for jury). Accordingly, JEC

8

was not entitled to a judgment in its favor on the ground that Tetreault's testimony, in JEC's view, was not credible.

Additionally, while it "is axiomatic that to create an enforceable contract, there must be agreement between the parties on the material terms of that contract[,] . . . [i]t is not required that all terms of the agreement be precisely specified."  Id. at 878 (citations omitted).  "The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'"  Id., quoting Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass 509, 517-518 & n.4 (1998), cert. denied, 525 U.S. 1177 (1999).  Although there was no dispute that the parties did not specify the precise amount that Tetreault was allowed to withdraw each month, Tetreault's testimony provided a sufficient basis from which the jury could infer that he and Gorman had agreed that he was entitled to significant compensation.  Given these circumstances, the failure to specify the amount did not render the agreement unenforceable.

2.  Theory of liability.  The judge concluded that the evidence supported only one viable theory of liability, namely breach of contract.[11]  As a result, he declined to instruct the

_____

[11] JEC also challenges the judge's instruction on breach of contract and argues that the judge erred when he stated "Tetreault has testified that the agreement was modified . . . to have [JEC] pay his personal credit card bills in an

9

jury on JEC's claims of conversion or money had and received.
We discern no error.

"The elements of conversion may be established by a showing
that one person exercised dominion over the personal property of
another, without right, and thereby deprived the rightful owner
of its use and enjoyment." Matter of Hilson, 448 Mass. 603, 611
(2007). At trial, the judge ruled that the evidence did not
support a claim of conversion because Tetrault had control over
JEC's finances. In other words, Tetreault properly "exercised
dominion" over the funds at issue. The judge stated:

> "[conversion] does not apply here because, to prove
> conversion, you have to prove that the defendant did not
> have possession of the money or other property. And here,
> there's no dispute that Tetreault was in charge of the
> finances. He had control over where the money went.

In denying JEC's motion for a new trial, the judge explained his
ruling that conversion did not apply slightly differently.
Relying on Gossels v. Fleet National Bank, 453 Mass. 366, 372
(2009), in which the Supreme Judicial Court stated "[c]onversion
occurs only when a defendant exercises wrongful control over
specific personal property, not a debt; therefore, bank accounts
cannot be the subject of conversion[,]" the judge determined

---

unspecified amount," as "there was no such testimony nor
evidence of any such statements, agreements, nor . . .
understanding between the parties." However, there was no
objection to this language and, therefore, the argument is
waived, and we need not address it. See Hill v. Metropolitan
Dist. Comm'n., 439 Mass. 266, 275 (2003).

10

that Tetreault's conduct of "divert[ing] the company's credit by use of credit cards and transfers from a bank account and then altered bank statements and records to conceal the transfers" did not support a claim of conversion.

Although we believe that the facts presented here are distinguishable from those in Gossels, supra, we agree with the judge that the evidence did not support a claim of conversion. First, there is no question that Tetreault had control over the company's finances. Second, and more importantly, the jury unequivocally decided that Tetreault's control over the company's finances was not wrongful. Thus, even if we were to assume that the evidence established the elements of conversion, there was no prejudicial error because the jury rejected JEC's assertion that Tetreault took the money without authority. The judge instructed the jury that "the issues for you to decide are simple and pretty straightforward . . . did Tetreault take (i.e. convert) more compensation than he was entitled to under the employment agreement" and "if so, how much more did he take than he was entitled to?" To answer this question, the jury had to decide whether Tetreault had a right to the money he took. Ultimately, JEC's claim of conversion was no more than an alternative theory, which the jury would have rejected for the same reason that it concluded there was no breach of contract.

11

With regard to JEC's claim that the judge erred by not submitting its claim of money had and received to the jury, we agree with the judge that this theory of liability only applies where, unlike here, there is no adequate remedy at law. See Ruiz v. Bally Total Fitness Holding Corp., 447 F.Supp.2d 23, 29 (D. Mass. 2006) ("money had and received [is an] equitable cause[] of action . . . available to plaintiffs who lack adequate remedies at law"). Here, the judge correctly concluded that the evidence established that JEC and Tetreault had an employment agreement. The dispute between the parties centered on the terms of the agreement, and, if Tetreault breached the agreement, the amount of damages owed to JEC. In other words, the evidence supported a viable claim for a breach of contract, an adequate remedy at law. See 477 Harrison Ave., LLC v. JACE Boston, LLC, 483 Mass. 514, 523 (2019). Accordingly, we discern no error in the judge's decision to deny JEC's request to instruct the jury on money had and received.

3. The verdict slip. Lastly, JEC argues that it is entitled to a new trial based on the judge's handling of the jury verdict. JEC alleges that the judge secretly asked the foreperson to strike the handwritten words "not guilty" on the verdict slip and doing so was a violation of due process and contrary to the procedure set forth in Mass. R. Civ. P. 49, 365

12

Mass. 812 (1974), regarding inconsistent verdicts.  We do not agree.

First, we are not persuaded by JEC's claim that the judge acted secretly or in any way improperly after the jury returned its verdict.  Simply put, there was no subterfuge.  After the judge was given the verdict slip from the court officer who had taken it from the foreperson, he said: "All right.  So we don't need the additional writing on the verdict slip.  That's not necessary.  So I'm just going to ask the foreperson to cross that out and initial it, and the verdict will otherwise stand."[12] This occurred in the presence of the jury, the parties, and counsel; the transcript reflects no sidebar discussion.  The judge responded to JEC's allegations in his memorandum and order wherein he stated,

> "The court never held a private meeting with the foreperson of the jury or secretly altered the verdict slip.  During the return of the verdict, the judge never called the foreperson to the bench.  The foreperson never left the jury box.  The court publicly directed the foreperson to strike out an extraneous remark on the verdict slip . . . .  Everything took place in open court on the record."

---

[12] JEC submitted several affidavits from individuals in the courtroom, at least four of whom were affiliated with JEC, and each affiant stated they did not hear the judge's statement which was captured on the record.  Tetreault filed an affidavit in which he stated he clearly recalled hearing the judge's statement in court.  Because we rely on the official transcript which makes clear that the entire sequence of events occurred in open court, we need not consider the information contained within any of the affidavits.

13

Based on the foregoing, which is supported by the official record of the proceedings, we reject without hesitation JEC's arguments that the judge violated JEC's right to due process.[13]

We also reject JEC's claim that the verdict was ambiguous or inconsistent due to the addition of the words "not guilty." It suffices to note that the words "not guilty," in the circumstances of this case, constituted no more than mere "surplusage."  Collings v. Pioneer Shade & Screen Co., 356 Mass. 729 (1969) (addition of written word "Guilty", to verdict for plaintiff in civil case was "pure surplusage [and] not inconsistent with the verdicts for the plaintiffs").

We affirm the judgment and the orders denying JEC's (i) motion for a new trial, (ii) motion for judgment notwithstanding

---

[13] The judge imposed a sanction on JEC's counsel in connection with his misrepresentations about what occurred in the courtroom.  Although JEC appealed from that order, it did not address the issue in its brief and, therefore, any argument regarding the sanction is waived.  See Mass. R. A. P. 16(a)(9)(A), as appearing in 481 Mass. 1628 (2019).

14

the verdict or, in the alternative for a new trial, and (iii) motions for reconsideration, and the order imposing sanctions.

So ordered.

By the Court (Vuono, Neyman & Sacks, JJ.[14]),

*Paul Little*

Clerk

Entered:  May 12, 2026.

---

[14] The panelists are listed in order of seniority.