WAYNE SCOTT, trustee,[1] *vs.* NG US 1, INC.,[2] & others.[3]

No. 05-P-1050.

Suffolk. March 16, 2006. - October 2, 2006.

Present: LENK, CYPHER, & GRAHAM, JJ.

Further appellate review granted, 448 Mass. 1101 (2006).

*Massachusetts Oil and Hazardous Material Release Prevention Act. Hazardous Materials. Corporation,* Corporate disregard, Corporate successor liability. *Practice, Civil,* Attorney's fees. *Words,* "Operator."

In a civil action by a property owner for damages and reimbursement of response costs arising from his cleanup of hazardous materials that had migrated onto his property, the judge correctly concluded that the defendant corporation that became the parent of the responsible company after the time of the contamination could not be considered a "present operator" for purposes of the Massachusetts Oil & Hazardous Material Release Prevention Act, G. L. c. 21E, § 5(*a*)(1), where the parent was not at the present time operating the site that caused the contamination. [477-479]

In a civil action by a property owner for damages and reimbursement of response costs arising from his cleanup of hazardous materials that had migrated onto his property, the defendant corporation that became the parent of the responsible company after the time of the contamination was subject to derivative liability for its subsidiary's contamination of the plaintiff's property through the equitable doctrine of "piercing the corporate veil," where invocation of the doctrine would further the purpose of the Massachusetts Oil & Hazardous Material Release Prevention Act, G. L. c. 21E, of holding the party responsible for environmental contamination responsible for the cost of its cleanup; where the record was replete with evidence that the defendant controlled the responsible company; and where, although the responsible company released the hazardous materials years before the defendant took control of its operations, the contamination and migration of hazardous materials, and the dangers to the public and environment posed thereby, were ongoing. [479-485]

In a civil action by a property owner for damages and reimbursement of response costs arising from his cleanup of hazardous materials that had migrated onto his property, the defendant corporation, which had purchased the responsible company from a third-party corporation years after the contamination, was not liable for the cleanup costs as a successor corpora-

[1]Of 12 Woodbury Court Trust.

[2]Also known as National Grid USA.

[3]Boston Gas Company, doing business as KeySpan Energy Delivery New England, and KeySpan New England, LLC, also known as KeySpan Corp.

tion, where there was a lack of continuity in management, officers, directors, and shareholders between the third-party corporation and the defendant corporation, and where nothing in the purchase agreement transferred the third-party corporation's liability for environmental damages to the defendant. [485-488]

The judge in a civil action properly denied the defendants' requests for attorney's fees under G. L. c. 21E, § 4A(*f*), where the record demonstrated that the plaintiff's claims against each defendant were reasonable, and where the record did not establish that the plaintiff refused to participate in negotiation or dispute resolution in good faith. [488-489]

CIVIL ACTION commenced in the Superior Court Department on September 5, 2002.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment, and motions for awards of attorney's fees were also heard by him.

*Evan Slavitt* for the plaintiff.

*Robert C. Kirsch* for NG US 1, Inc.

*Martin C. Pentz* (*Karen L. Crocker* with him) for Boston Gas Company.

CYPHER, J. The plaintiff, Wayne Scott, trustee of 12 Woodbury Court Trust, purchased property in Salem in January, 2002, with the plan to build two townhouses. As construction got underway, Scott discovered that the site was contaminated with material resembling coal tar. The likely source of the contamination was the property on the northern boundary, formerly home to a gas manufacturing plant that used coal in the production of gas in the 1800's. Scott has since undertaken remedial action to assess, contain, and remove the hazardous materials, assumed, for our purposes, to have migrated onto his property from the former gas facility. In this action, Scott seeks damages and reimbursement for his response costs from the defendants, pursuant to G. L. c. 21E, the Massachusetts Oil & Hazardous Material Release Prevention Act (Act), based on their prior connections to the gas company that operated the offending facility.

According to the record, the gas manufacturing plant that formerly occupied the site adjacent to Scott's property was originally owned and operated by Salem Gas Light Company (Salem Gas). Between 1850 and 1890, Salem Gas used the facility, located on Northey Street in Salem, to manufacture gas

from coal. When the plant ceased operations in 1890, the property was sold to a third party, not here identified. The plant itself was dismantled as of 1906. After leaving Northey Street, Salem Gas resumed operations at a site on Pierce Street in Salem and remained at that site until 1953.

The history that connects Salem Gas to the current defendants is based on undisputed facts. Between 1926 and 1931, North Boston Lighting Properties (NBLP), a utility holding company, purchased shares of Salem Gas stock. New England Power Association (NEPA) then purchased NBLP stock, so that Salem Gas became a subsidiary of NEPA. In 1947, a reorganization of NEPA led to the formation of New England Electric System (NEES), with NEES becoming the parent of Salem Gas. NEES formed an unincorporated gas division in 1951 to oversee its gas operations. In 1952, NEES organized North Shore Gas (North Shore), to acquire Salem Gas and other NEES gas subsidiaries. NEES consolidated the gas operations of Salem Gas, Gloucester Gas Light Company, and Beverly Gas and Electric Company into North Shore in 1953. North Shore thereafter operated the Pierce Street facility.

In 1964, the Securities and Exchange Commission (SEC) ordered NEES to divest itself of all gas subsidiaries. In 1973, NEES entered into an agreement to sell North Shore's stock, along with that of Lynn Gas Company and Mystic Valley Gas Company, to Boston Gas's parent, Eastern Gas & Fuel Associates (Eastern), for $26,888,351.75, adjusted for the stock's book value as of the date of closing. North Shore's assets were purchased by Boston Gas, which, pursuant to the defendants' asset purchase agreement, also assumed the liabilities of North Shore "as then existing." After the closing, all outstanding shares of North Shore were liquidated. Many of North Shore's employees accepted jobs with Boston Gas, but management of the gas operation was taken over by the existing management of Boston Gas. In 2002, Eastern was merged into KeySpan New England, and Boston Gas became a KeySpan New England subsidiary. NEES has been succeeded by NG US 1, Inc., doing business as National Grid USA.

Scott filed his complaint in this action on September 5, 2002, alleging that the defendants were liable, pursuant to G. L.

c. 21E, § 5, for the spread of hazardous materials to his property, based on their respective relationships with Salem Gas. The parties filed cross motions for summary judgment. The judge ruled in favor of the defendants, determining that neither NEES nor Boston Gas was liable, directly or as corporate successors, for the harm caused by Salem Gas's operations. The plaintiff filed this appeal. The defendants filed cross appeals from the judge's denial of their respective claims for attorney's fees.

We turn first to the plaintiff's claims against NEES.

1. *NEES as an "operator" under G. L. c. 21E.* General Laws c. 21E, § 4, provided Scott, as one who undertook the cleanup of hazardous materials that migrated onto his property, with a private right of action to seek recovery of his response costs from the parties responsible for the contamination.[4] See *Garweth Corp.* v. *Boston Edison Co.*, 415 Mass. 303, 307 (1993); *Mailman's Steam Carpet Cleaning Corp.* v. *Lizotte*, 415 Mass. 865, 873-874 (1993); *Hill* v. *Metropolitan Dist. Commn.*, 439 Mass. 266, 269 (2003). Scott also sought recovery of damages from the defendants for the diminution in value of his property, as well as other economic losses, pursuant to G. L. c. 21E, § 5(*a*).[5] See *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. 332, 334 (1993); *Hill* v. *Metropolitan Dist. Commn., supra* at 269. Persons liable for the release of hazardous material are identified in G. L. c. 21E, § 5(*a*)(1)-(5). See *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 298 (1997).

Scott charged NEES with liability for his response costs and damages, under the theory that NEES should be treated as a present operator of the Northey Street site pursuant to G. L.

---

[4]General Laws c. 21E, § 4, as amended by St. 1992, c. 133, § 293, provides, in relevant part, that "[a]ny person who undertakes a necessary and appropriate response action regarding the release or threat of release of oil or hazardous material shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action."

[5]General Laws c. 21E, § 5(*a*)(5)(iii), inserted by St. 1983, c. 7, § 5, provides, in relevant part, that "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material . . . shall be liable, without regard to fault . . . to any person for damage to his real or personal property incurred or suffered as a result of release or threat of release."

c. 21E, § 5(*a*)(1), as well as a person otherwise responsible for the release of hazardous materials under G. L. c. 21E, § 5(*a*)(5).[6] With respect to liability as a present operator under G. L. c. 21E, § 5(*a*)(1), the judge correctly rejected the plaintiff's claim, because NEES was not currently operating the Northey Street site. See *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. 824, 827 (1993), *S.C.*, 420 Mass. 365 (1995) (under § 5[*a*][1], "only present owners or operators are strictly liable where there has been a release of oil or hazardous materials on their property, regardless of when the release itself occurred"); *Martignetti* v. *Haigh-Farr, Inc.*, *supra* at 304 n.20.

On appeal, Scott asserts that NEES should be treated as a present operator nonetheless, because NEES is presently storing hazardous wastes at the site — that is, the coal tar that was left behind by its former subsidiary. The plaintiff argues that the discharge of hazardous materials into the soil at the Northey Street site, and their continued presence there, is equivalent to storage in containers or a lagoon and that, so long as NEES fails to remove the hazardous materials and clean up the site, NEES continues to be an operator of the site under G. L. c. 21E, § 5(*a*)(1). The plaintiff cites to no authority for this broad interpretation of what constitutes a present operator under the statute, and we decline to extend its meaning to an entity in NEES's position that never conducted any activities at the site.

In any event, as NEES points out, another subsection of the statute, § 5(*a*)(2), imposes liability on "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a

_____

[6]General Laws c. 21E, § 5, as inserted by St. 1983, c. 7, § 5, provides, in relevant part:

> "(a) Except as otherwise provided in this section, (1) the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material; . . . and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable without regard to fault, . . . (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release . . . ."

release . . ." Section 5(*a*)(2) encompasses past operators of sites where hazardous wastes were stored or disposed of, and would be superfluous under the plaintiff's expansive reading of § 5(*a*)(1). See generally *Kobrin* v. *Gastfriend*, 443 Mass. 327, 332 (2005) (no part of a statute should be regarded as superfluous).

2. *Piercing the corporate veil.* While NEES is not directly liable as a present operator under G. L. c. 21E, § 5(*a*)(1), we are mindful that NEES, as the parent corporation of Salem Gas and North Shore, still may be subject to derivative liability for its subsidiary's contamination of the Northey Street site through the doctrine of "piercing the corporate veil." See *United States* v. *Bestfoods*, 524 U.S. 51, 63-64 (1998). See also *Martignetti* v. *Haigh-Farr, Inc., supra* at 301 n.16. The doctrine is an equitable one, permitting the court to set aside the separate corporate form that would ordinarily protect a parent from the liability of its subsidiary. "Particularly is this true (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent purpose or injurious consequences of the intercorporate relationship . . . ." *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 619 (1968). The judge here rejected the doctrine's application in this case, reasoning that the corporate relationship between NEES and Salem Gas did not exist in the late 1800's, when Salem Gas released hazardous materials at the Northey Street site.

In considering whether equitable principles warrant veil-piercing, there is a tendency to highlight aspects of the relationship between a parent and a subsidiary that evince some unsavory motive or other impropriety in the use of separate corporate forms. See, e.g., *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 621 (individual controlling several separate corporations failed to "dispel ambiguities" as to which entity he represented in dealing with the plaintiff and used the corporate form in a "very confused manner"). See also *Dale* v. *H.B. Smith Co.*, 910 F. Supp. 14, 18 (D. Mass. 1995) (disregarding separate corporate form "is particularly appropriate where there is fraud and injurious consequences from such an intercor-

porate relationship"). But in Massachusetts, public policy and statutory purpose are important considerations in the equitable mix. As explained by the Supreme Judicial Court in *Attorney Gen.* v. *M.C.K., Inc.,* 432 Mass. 546, 555 (2000):

> "The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice. See *My Bread Baking Co.* v. *Cumberland Farms, Inc.,* [*supra* at 620]. In certain situations, the doctrine may also properly be used to carry out legislative intent and to avoid the evasion of statutes. See *Packard Clothes, Inc.* v. *Director of the Div. of Employment Sec.,* [318 Mass. 329, 335 (1945)]. See also C.A. Peairs, Jr., Business Corporations § 646, at 565 (2d ed. 1971) ("corporate entity will be disregarded when necessary to . . . consummate the objective of a statute or other overriding public policy which would be frustrated by observance of the entity").

Thus, in *Attorney Gen.* v. *M.C.K., Inc., supra,* the court acknowledged that no impropriety necessarily attached to the use of two separate corporations to carry out the business objectives of the single person who controlled them. "Nevertheless, when one of the corporations . . . later seeks to disassociate itself from the other . . . , in a way that leads to complete frustration of a statutory purpose, the court may be warranted in carefully scrutinizing the corporate form, regardless whether actual fraud has been shown." *Id.* at 557.

Undoubtedly, a significant statutory purpose is at stake here. The statute's principal objective, that is, the prompt "assessment, containment and removal," G. L. c. 21E, § 4, of releases of hazardous materials, is advanced by requiring prompt response action by even an innocent property owner, and then allowing for reimbursement to the property owner by the party actually responsible for the problem. See *Martignetti* v. *Haigh-Farr, Inc.,* 425 Mass. at 320. Accordingly, in considering whether to pierce the corporate veil, we take into account one of the primary aims of G. L. c. 21E, that the party that caused the environmental contamination should be responsible for the cost of its cleanup. See *Garweth Corp.* v. *Boston Edison Co.,*

415 Mass. at 307; *Guaranty-First Trust Co.* v. *Textron, Inc.*, 416 Mass. at 335; *Taygeta Corp.* v. *Varian Assocs.*, 436 Mass. 217, 223 (2002).

Furthermore, unlike direct liability as an owner or operator under G. L. c. 21E, § 5, our focus in considering whether to pierce the corporate veil is on the parent's control of the subsidiary itself, rather than its control of the facility where the contamination occurred. See *United States* v. *Bestfoods*, 524 U.S. at 68 (comparing the focus on the parent's control of a facility under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq. [CERCLA], to the parent's control of the subsidiary in a veil-piercing inquiry). Here, we have before us evidence, assumed true for purposes of these proceedings, identifying Salem Gas as the entity that caused the initial release of hazardous materials, as well as evidence of the chain of corporate consolidation and succession that linked Salem Gas to NEES's control.

The record here is replete with evidence supporting the plaintiff's position that NEES controlled Salem Gas, and subsequently North Shore, to such an extent as to raise a question of fact whether NEES should be held liable for its subsidiary's actions. In *Securities & Exch. Commn.* v. *New England Elec. Sys.*, 390 U.S. 207, 212 (1968), which addressed the divestiture order against NEES, the United States Supreme Court observed that "[t]he eight gas companies were organized administratively as a Gas Division with centralized management, marketing and supply, operations, and merchandising departments," the chief executive of which answered to NEES's vice president in charge of management. In that case, because NEES exercised joint control over NEES's gas divisions as well as its electric operations through a central management, the divestiture order regarding the gas divisions was held to be warranted. The evidence of NEES's pervasive control over its gas companies was, indeed, "almost overwhelming." *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir. 1993) (describing NEES's control over Lynn Gas, another of its gas subsidiaries managed in a similar fashion to Salem Gas). Similarly, according to the Federal District Court judge's find-

ings in John S. Boyd Co. *vs.* Boston Gas Co., U.S. Dist. Ct., No. Civ. A. 89-675-T (D. Mass. 1992), NEES exercised significant control over its gas companies' management, budgets, personnel, and operations, including hazardous waste policies.

NEES counters that, in order to justify piercing the corporate veil, the parent must be in control of the subsidiary at the time the offensive conduct occurred. See, e.g., *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. at 619 ("injurious consequence[s]" resulting from the intercorporate relationship). See also *Dale* v. *H. B. Smith Co.*, 910 F. Supp. at 19 (interpreting Massachusetts law under *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra*, as requiring evidence that the parent controlled the subsidiary "at any relevant time"). NEES reiterates the judge's reasoning here, in granting NEES's motion for summary judgment, that because Salem Gas released contaminants at the Northey Street site many years before Salem Gas came under NEES's control, NEES's control was unrelated to the damage caused by the spread of hazardous materials to the plaintiff's property.

"But, while CERCLA does not require wholesale abandonment of conventional principles for determining corporate liability, 'the policies underlying the statute in question can direct the emphasis the court will place on the various factors examined in deciding whether to pierce the corporate veil.' " *John S. Boyd Co.* v. *Boston Gas Co.*, 775 F. Supp. 435, 442 (D. Mass. 1991), quoting from *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 33 (D. Mass. 1987). Taking our lead from the application of CERCLA, see *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. at 827-829, we refer to the policies underlying G. L. c. 21E to determine whether "injurious consequences" flowed from NEES's control over Salem Gas.

As previously explained, the policies underlying G. L. c. 21E are principally concerned with the prompt response to releases of hazardous materials and the recovery of response costs from those responsible. See *Garweth Corp.* v. *Boston Edison Co.*, 415 Mass. at 307. The reach of the statute, and indeed much of its content, goes far beyond the instant in time when hazardous

materials come into contact with the soil, focusing instead on actions and obligations undertaken in the assessment, containment, and removal of those materials. See generally *Sheehy* v. *Lipton Indus., Inc.,* 24 Mass. App. Ct. 188, 197 (1987) ("the Act is drafted in a comprehensive fashion to compel the prompt and efficient cleanup of hazardous materials"). As such, while Salem Gas may have released hazardous materials into the land at Northey Street years before NEES took control of its operations, the record indicates that the contamination and migration of hazardous materials resulting from that release, and the dangers to the public and the environment posed thereby, continued over the last century and persisted up to the time this action was filed in September, 2002.

We emphasize that by considering the injurious consequences of the corporate relationship in a broader context, we do not enlarge the definition of an owner or operator who is directly liable under G. L. c. 21E, § 5(*a*)(1), as the plaintiff urges; we speak only to the equitable considerations that come into play when applying the statutory objectives to the common-law doctrine of piercing the corporate veil. We deal here with a statutory scheme that recognizes the ongoing nature of the harm caused by releases and that specifically imposes obligations on the party responsible for the continuing harm, even when the release occurred long ago or the party is no longer involved at the site where the harm originated. See, e.g., G. L. c. 21E, § 5(*a*)(2); *Sheehy* v. *Lipton Indus., Inc., supra* (§ 5[*a*][2] extends c. 21E liability to prior owners of property where hazardous materials have been stored).

Consequently, in weighing the factors that determine whether NEES may remain insulated behind its separate corporate form, our inquiry does not end with the fact that the relationship between NEES and Salem Gas came into being years after the hazardous materials were initially released at the Northey Street site. We may also consider their relationship during the period when the harm from that release persisted, unabated and unmitigated, to the point where surrounding properties were contaminated as well. To the extent NEES controlled Salem Gas, it may be reasonable to infer, from materials in the record, that NEES set the policies for Salem Gas with respect to

identifying, investigating, or responding to the contamination caused by its operations, past and present, and that NEES controlled the funding with respect to those policies. See, e.g., *John S. Boyd Co.* v. *Boston Gas Co.*, 775 F. Supp. at 442, citing *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. at 34 ("In CERCLA actions, evidence of pervasive parental control over hazardous waste disposal policies assumes particular importance in a decision to pierce the corporate veil"). See also *Smith Land & Improvement Corp.* v. *Celotex Corp.*, 851 F.2d 86, 92 (3d Cir. 1988), cert. denied, 488 U.S. 1029 (1989) (as between a successor corporation and the taxpayers, "entities which had a specific role in the production or continuation of the hazardous condition" should bear the burden of cleanup); *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d at 405-406.

For example, the record suggests that gas manufacturing companies in Massachusetts were aware of certain health and environmental dangers posed by their coal to gas operations in the late 1800's, at the time Salem Gas operated the Northey Street plant. By the time NEES took over Salem Gas, it appears that the utility companies knew significantly more about those dangers, and regulations had been established by that time to restrict or prohibit the disposal of coal tar and other hazardous wastes.[7] Faced with such information, even NEES's failure to act in order to identify the threat to public safety and to the environment, and to prevent the spread of dangerous contamination at a site formerly operated by its subsidiary, could be construed by a fact finder as an "injurious consequence" of NEES's control.

These equitable considerations regarding policy-making and financial control also come into play in connection with NEES's

[7]A May 25, 1990, report on the dangers to public health posed by gas manufacturing in the late 1800's, authored as part of a settlement agreement between several gas companies, including Boston Gas, and the Department of Public Utilities, indicated that the health hazards associated with gas manufacturing plants prompted the passage of regulatory measures as early as the late 1800's. According to this document, gas companies were increasingly subject to private lawsuits for damages caused by the manufacturing plants to land, animals, crops, vegetation, and water resources. The report also indicates that by the 1930's, the link between coal tar and cancer had been conclusively established.

1973 sale of North Shore to Boston Gas. According to the record, at the time of the sale, NEES made representations to the SEC and to the public that Boston Gas would assume all liabilities of its gas subsidiary. In fact, the purchase agreement limited Boston Gas's assumption of liabilities to those identified and in existence at the time of the sale. Moreover, NEES received the purchase monies from Boston Gas when it sold North Shore, and as a result of NEES's control, North Shore had no assets to answer for the cost of the Northey Street site's remediation — this, despite evidence in the record indicating that the industry by that time had significant information about the continuing harm caused by their earlier methods of operation, and had been exposed to pre-CERCLA lawsuits based on common-law principles for damage caused by contaminants that crossed sites' boundaries.

We think both equity and public policy cut against a determination as a matter of law that corporate form and the passage of time protected NEES from the liabilities of Salem Gas, especially when an innocent third party will be left with the expense of the present-day cleanup. As the United States Court of Appeals for the First Circuit observed in *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d at 405, wherein NEES was held liable for coal tar contamination at another gas plant site, "[w]hen NEES sold the gas portion of Lynn Gas and Electric Co. to the newly-created Lynn Gas Co., the environmental liabilities of Lynn Gas and Electric did not disappear." So too, here, neither the coal tar on the plaintiff's property nor responsibility for its cleanup simply disappeared over time. We conclude that the plaintiff's claim against NEES, under the doctrine of piercing the corporate veil, warrants further evaluation of the evidence bearing on the relationship between NEES and Salem Gas, and the "injurious consequences" flowing therefrom, during the period that NEES exercised pervasive control over its subsidiary. See, e.g., *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. at 555 & n.19. We therefore vacate the entry of summary judgment in NEES's favor on the plaintiff's claim pursuant to G. L. c. 21E.

3. *Claims against Boston Gas.* The plaintiff also brought claims against Boston Gas, charging it with liability for the

cleanup costs, pursuant to its 1973 purchase of North Shore, into which Salem Gas had been consolidated, from NEES. The plaintiff based his G. L. c. 21E claim on statutory and common-law principles of successor liability, as well as on the assumption of liabilities provision in the defendants' asset purchase agreement.

The judge was correct in ruling that the sale of North Shore to Boston Gas did not constitute a de facto merger or mere continuation of the business, so as to justify the transfer of Salem Gas's environmental liabilities to Boston Gas.[8] Factors considered in determining whether a sale should be treated as a de facto merger are "whether (1) there is a continuation of the enterprise of the seller corporation so that there is a continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." *Cargill, Inc.* v. *Beaver Coal & Oil Co.*, 424 Mass. 356, 359-360 (1997).

"In determining whether a de facto merger has occurred, courts pay particular attention to the continuation of management, officers, directors and shareholders." *Id.* at 360. See *Dayton* v. *Peck, Stow & Wilcox Co.*, 739 F.2d 690, 693 (1st Cir. 1984), quoting from *Leannais* v. *Cincinnati, Inc.*, 565 F.2d 437, 440 (7th Cir. 1977) ("The key element of a 'continuation' is a common identity of the officers, directors and stockholders in the selling and purchasing corporations"). We agree with the judge that here, the lack of continuity in management, officers,

---

[8]Taking our lead from the Federal District Court judge's observation in *In re Acushnet River & New Bedford Harbor Proceedings*, 712 F. Supp. 1010, 1019 n.15 (D. Mass. 1989), that the "the de facto merger exception subsumes the continuation exception," we will discuss the doctrines as one.

directors and shareholders between North Shore and Boston Gas undercut the justification for transferring Salem Gas's environmental liability to Boston Gas. While the plaintiff points to language in our cases indicating that no single factor is necessary to establish a de facto merger, see, e.g., *Cargill, Inc.* v. *Beaver Coal & Oil Co., supra,* we have here the notable absence of the most critical ones. The fact that certain North Shore management-level employees and many of the nonmanagement employees were hired by Boston Gas does not translate into continuity of management; the record indicates that, prior to the sale, the management of Salem Gas, and subsequently North Shore, was controlled by NEES. That services to the utility customers were uninterrupted and that North Shore was liquidated after the sale do not, of themselves, render the purchase a de facto merger or continuation.[9]

There is no authority to support the plaintiff's argument that G. L. c. 164, § 98, which, together with §§ 97 through 101, governs the merger or transfer of hydroelectric plants within Massachusetts, imposed North Shore's environmental liabilities for the Northey Street site on Boston Gas when it purchased North Shore from NEES.[10] As the judge here explained, the First Circuit in *John S. Boyd Co.* v. *Boston Gas Co.,* 992 F.2d at 409, rejected NEES's argument that the statute imposed contingent environmental liabilities on Boston Gas beyond those identified in the parties' purchase agreement. This view is confirmed when we look at G. L. c. 164, § 98, in the context of the statute as a whole. See, e.g., *Kobrin* v. *Gastfriend,* 443

---

[9]The plaintiff's focus on Eastern's role in the purchase, as somehow providing the requisite continuity, is unpersuasive. As the court in *John S. Boyd Co.* v. *Boston Gas Co.,* made clear, Eastern's role in purchasing North Shore's stock has no bearing in determining whether the transfer of Lynn Gas to Boston Gas constituted a de facto merger or continuation. *John S. Boyd Co.* v. *Boston Gas Co.,* 992 F.2d at 407 n.5 ("Because this intermediate transaction does not alter any liability in this case by statute, contract, or any other norm, we discuss Eastern no further"). The same holds true here.

[10]General Laws c. 164, § 98, entitled "Rights of company acquiring water storage reservoir or hydro-electric plant," provides in relevant part: "The purchasing or consolidated company shall . . . have and enjoy all the powers, rights, locations, licenses, privileges and franchises, and be subject to all the duties, liabilities and restrictions, of the company selling or merged as aforesaid, so far as they are applicable to the purchasing or consolidated company."

Mass. at 331 (statute is to be construed according to its purpose, ascertained from all its words). General Laws c. 164, §§ 96 through 101, are principally concerned with the Department of Telecommunications and Energy's oversight of hydroelectric plant acquisitions, providing for public hearings and the department's approval in furtherance of the public interest regarding such factors as the quality of services, the recovery of merger-related costs, and utility rates charged to customers. See generally *Attorney Gen.* v. *Department of Telecommunications & Energy*, 438 Mass. 256, 262, 269 (2002). Therefore, absent authority to the contrary, we decline to construe § 98 as reaching beyond its regulatory framework to impose environmental liabilities on Boston Gas beyond those identified in the parties' agreement.

Finally, the plaintiff points to the assumption of liabilities language in the purchase agreement between Boston Gas and NEES, whereby Boston Gas expressly assumed certain of North Shore's liabilities. In considering the same contractual language in Boston Gas's purchase of Lynn Gas from NEES, the First Circuit instructed that the limiting language regarding the assumption of Lynn Gas's then-existing liabilities did not operate to transfer to Boston Gas the subsequent liability for environmental damages caused by Lynn Gas; that liability remained with NEES. *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d at 406-407. Thus it was held that Boston Gas's agreement to assume certain liabilities in purchasing NEES's gas company did not encompass environmental liabilities under CERCLA that were not known by the parties at the time of the agreement. We see no reason to depart from the First Circuit's analysis in our interpretation of the contractual arrangement here. As between NEES and Boston Gas, absent express language in the purchase agreement, responsibility under G. L. c. 21E for Salem Gas's contamination at the Northey Street site remained, if at all, with NEES.

4. *Attorney's fees.* Based on the foregoing, we need not address the cross appeal of NEES regarding its entitlement to attorney's fees under G. L. c. 21E, § 4A(f).[11] In any event, as to

---

[11]General Laws c. 21E, § 4A(f), inserted by St. 1992, c. 133, § 294,

both defendants, the issues presented on appeal amply reveal the challenges faced by an innocent property owner who, having identified the entity that arguably caused the contamination, struggles with the web of corporate reincarnations that followed, in an attempt to find the appropriate party or parties to be charged with the cleanup.

With respect to Boston Gas's cross appeal, the case of *John S. Boyd Co.* v. *Boston Gas Co.*, *supra*, while instructive, did not clearly establish Boston Gas's defense to the plaintiff's claim of assumption of the liability by contract, as Boston Gas insists. The First Circuit was applying CERCLA to a dispute between the two utilities to determine which one was liable for the government's response costs. We deal here with a matter involving G. L. c. 21E and corporate successor liability towards an innocent third party.[12] While the First Circuit's reasoning provided persuasive authority for the result reached here, we also agree with the judge's conclusion that the application of *John S. Boyd Co.* v. *Boston Gas Co.*, *supra*, to parties involved in this case was not so clear cut as to render the plaintiff's claims against Boston Gas unreasonable.

In addition, as noted by the judge, the record does not establish that the plaintiff refused to participate in negotiation or dispute resolution in good faith. The judge's denial of the defendants' requests for attorney's fees was thoroughly justified.

5. *Conclusion.* Summary judgment for NEES on the plaintiff's claim asserting liability for the contamination of the Northey Street site, and the damages to the plaintiff's property allegedly caused thereby, pursuant to the doctrine of piercing the corporate veil is reversed, and the case is remanded for further proceed-

provides: "If the court finds that (1) the plaintiff did not participate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability pursuant to the provisions of this chapter was unreasonable, it shall award litigation costs and reasonable attorneys' fees to the defendant."

[12]*Atlas Tack Corp.* v. *Crosby*, 41 Mass. App. Ct. 429 (1996), upon which Boston Gas also relies, involved a very different factual scenario that would not have alerted the plaintiff to any unreasonableness regarding his claim against Boston Gas.

ings consistent with this opinion. In all other respects, the judgments are affirmed.

*So ordered.*