WAYNE SCOTT, trustee,[1] *vs.* NG US 1, INC.,[2] & others.[3]

Suffolk. November 6, 2007. - March 7, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Massachusetts Oil and Hazardous Material Release Prevention Act. Hazardous Materials. Corporation,* Corporate disregard, Corporate successor liability. *Practice, Civil,* Attorney's fees. *Words,* "Operator."

In a civil action by a property owner for damages and reimbursement of response costs arising from his cleanup of hazardous materials that had migrated onto his property, there was no occasion to disregard the corporate form of the defendant corporation, which became the parent of the responsible company many years after the time of the contamination, so as to hold the defendant derivatively liable for that company's actions as a past operator of the site under G. L. c. 21E, § 5 (*a*) (2) or (5), where the defendant lacked any interest in, and did not control, the subsidiary or its facility at the time of the acts giving rise to environmental liability. [764-772]

This court remanded a civil action to the Superior Court judge who had denied the defendants' request for attorney's fees pursuant to G. L. c. 21E, § 4A (*f*), for consideration whether the plaintiff, a property owner who sued for damages and reimbursement of response costs arising from his cleanup of hazardous materials that had migrated onto his property, had no reasonable basis to assert liability on the part of some of the defendants, and for consideration whether the mandatory nature of the predispute notice requirement in § 4A (*f*) affected the analysis regarding the comportment of the plaintiff's predispute activities with the requirement of good faith. [772-774]

CIVIL ACTION commenced in the Superior Court Department on September 5, 2002.

The case was heard by *Allan van Gestel,* J., on motions for summary judgment, and motions for awards of attorney's fees were also heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

[1] Of 12 Woodbury Court Trust.

[2] Also known as National Grid USA.

[3] Boston Gas Company, doing business as KeySpan Energy Delivery New England; and KeySpan New England, LLC, also known as KeySpan Corp.

*Joseph S.U. Bodoff* for the plaintiff.

*Robert C. Kirsch* (*Tina Y. Wu* with him) for NG US 1, Inc.

*Martin C. Pentz* (*Karen L. Crocker* with him) for Boston Gas Company & another.

*Martin J. Newhouse, Ben Robbins, Christopher P. Davis, & Christophe G. Courchesne*, for New England Legal Foundation & another, amici curiae, submitted a brief.

MARSHALL, C.J. Predominant among the issues raised in this appeal is whether a parent corporation first acquiring an ownership interest in a subsidiary corporation decades after the subsidiary both released environmentally hazardous material and sold the contaminated site, without more, may be liable under G. L. c. 21E for later incurred response costs at the site. We conclude that the parent corporation is not directly liable as an operator of the site.[4] We also conclude that, in the circumstances of this case, the parent corporation is not indirectly liable as an operator of the site where there are no grounds for piercing the corporate veil of the parent. We affirm the grant of summary judgment for all defendants, vacate the order denying the defendants' motions for litigation costs and attorney's fees, and remand for further proceedings on that issue.[5]

1. *Procedural background.* On cross motions for summary judgment and associated motions for attorney's fees and costs, a judge in the Superior Court granted the defendant corporations' motions for summary judgment and denied the plaintiff property owner's cross motion, concluding that the defendants were not

---

[4]General Laws c. 21E, § 5 (*a*), provides, in part:

> "(1) the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material; . . . and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault."

On appeal, the plaintiff does not argue that the defendant parent corporation has G. L. c. 21E liability as an owner (directly or indirectly) of the site.

[5]We acknowledge the amicus brief filed by the New England Legal Foundation and the Associated Industries of Massachusetts, Inc.

liable to the plaintiff for response costs or damages, pursuant to
G. L. c. 21E.[6] The judge also ruled that the defendants were not
entitled to their attorney's fees and costs, pursuant to G. L.
c. 21E, § 4A (f). The Appeals Court affirmed the judgment
except on one point: it concluded that a genuine issue of mate-
rial fact — concerning whether the corporate veil of New England
Electric System (NEES), the defendant NG US 1, Inc.'s, corporate
predecessor, could be pierced to impose derivative liability —
precluded entry of summary judgment, and accordingly vacated
the entry of summary judgment for NG US 1, Inc., on that
issue.[7] *Scott* v. *NG US 1, Inc.*, 67 Mass. App. Ct. 474, 485
(2006).

We granted the defendants' applications for further appellate
review without limitation, and have considered all of the issues
briefed and argued before the Appeals Court. See, e.g., *Brusard*
v. *O'Toole*, 429 Mass. 597, 606 n.11 (1999). For essentially the
reasons stated by the motion judge, and those expressed by the
Appeals Court in part 1 of its opinion, *Scott* v. *NG US 1, Inc.*,
*supra* at 477-479, as well as those articulated in *United States* v.
*Bestfoods*, 524 U.S. 51, 64-67 (1998) (circumstances supporting
direct liability of corporate parent as operator of facility), the
order of the Superior Court judge concluding that NEES is not
directly liable as an operator of the contaminated site pursuant
to G. L. c. 21E, § 5 (a) (1), was correct.[8] Likewise, for es-
sentially the reasons stated by the motion judge, and those
expressed by the Appeals Court in part 3 of its opinion, *Scott*
v. *NG US 1, Inc.*, *supra* at 485-488, the order of the Superior

[6]The Superior Court judge also denied two peripheral motions: the plaintiff's
motion to file his motion for summary judgment under seal; and the plaintiff's
emergency motion to strike the defendants' summary judgment motions.
Neither ruling is at issue on appeal.

[7]Although NG US 1, Inc., as New England Electric System's (NEES)
corporate successor, is the named defendant, we refer to it throughout as
NEES. The entity was known as NEES during much of the relevant period,
and both the Superior Court and the Appeals Court used that acronym.

[8]General Laws c. 21E, § 2, defines "[o]wner" or "[o]perator" as "any
person owning or operating such site," which "indicates that only present
owners or operators are strictly liable [under G. L. c. 21E, § 5 (a) (1),] where
there has been a release of oil or hazardous material on their property, regard-
less of when the release itself occurred." *Griffith* v. *New England Tel. & Tel.
Co.*, 414 Mass. 824, 827 (1993), *S.C.*, 420 Mass. 365 (1995).

Court judge allowing the defendant Boston Gas Company's motion for summary judgment was correct. We proceed, focusing our discussion solely on two remaining issues: first, whether the judge correctly ruled that the undisputed facts present no occasion to disregard NEES's corporate form to impose operator liability indirectly; and second, whether the judge properly denied the defendants' motions for attorney's fees and costs.

2. *Corporate background.* Apart from the attorney's fees and cost issue, the case is before us on appeal from the entry of summary judgment for the defendants. We consider the facts underlying those motions, and all reasonable inferences drawn therefrom, in their light most favorable to the plaintiff, the non-moving party.[9] See *Blare* v. *Husky Injection Molding Sys. Boston, Inc.*, 419 Mass. 437, 438 (1995); *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991). We review the Superior Court judge's legal conclusions de novo. *Maffei* v. *Roman Catholic Archbishop of Boston*, 449 Mass. 235, 243 (2007).

In January, 2002, the plaintiff, Wayne Scott, trustee of 12 Woodbury Court Trust, purchased property in Salem, intending to develop and sell townhouses on it. During construction, he discovered "highly volatile" coal tar, or a similar contaminant, on the property that, for purposes of summary judgment, was assumed to have migrated from abutting land on Northey Street (Northey Street property). From 1850 to 1890, the Northey Street property had been owned and operated by Salem Gas Light Company (Salem Gas) as a "gas works." The gas works facility ceased gas production in 1890, Salem Gas conveyed the property to a third party,[10] and the facility was dismantled by 1906, at the latest. Salem Gas, incorporated in Massachusetts in 1847, existed as an independent gas utility company until at least 1927. It continued to manufacture gas at another site in Salem until 1953.

In 1926, some thirty-six years after Salem Gas sold the Northey Street property, North Boston Lighting Properties (North Boston) began acquiring Salem Gas stock; by the following year, New England Power Association (NEPA), a corporate predecessor of

---

[9]For purposes of these proceedings, the parties stipulated to the facts concerning the corporate transactions.

[10]The third party is not named and is not a party to this action.

defendant NEES, had acquired almost six per cent of the voting power of outstanding shares of North Boston stock. By 1942 — more than fifty years after the Northey Street property had been sold — North Boston owned almost ninety-five per cent of Salem Gas, and by 1945, NEPA (through a holding company, Massachusetts Power and Light Associates [MPLA]) owned a substantial majority interest in North Boston. NEPA was reorganized in 1947, NEES was formed, and North Boston's assets (including its stock in Salem Gas) and obligations were transferred to NEES. Through these corporate transactions, Salem Gas became a subsidiary of NEES in 1947, and North Boston and MPLA were liquidated.

In 1951, NEES formed an unincorporated "gas division" and, in 1953, arranged for consolidation of the gas operations of Salem Gas and two other companies — Gloucester Gas Light Company and Beverly Gas and Electric Company — into a new company, North Shore Gas Company. In March, 1964, however, the Securities and Exchange Commission ordered NEES to divest itself of its gas operations. After its appeals were exhausted, on October 27, 1972, conditioned on regulatory approval, NEES sold all of its stock in North Shore Gas Company (of which the former Salem Gas was part) and two other companies (Lynn Gas Company and Mystic Valley Gas Company) to Eastern Gas & Fuel Associates. The stock purchase agreement provided that the companies would be acquired by or combined with Eastern Gas & Fuel Associates's subsidiary, Boston Gas Company (Boston Gas), one of the defendants in this action.

On January 23, 1973, Boston Gas, North Shore Gas Company, Lynn Gas Company, and Mystic Valley Gas Company executed an "Agreement for Purchase and Sale of Assets and Assumption of Liabilities." Under that agreement, Boston Gas agreed to purchase all assets of North Shore Gas, Lynn Gas, and Mystic Valley Gas "as then constituted," and to assume all liabilities of those three companies "as then existing." The defendant, NG US 1, Inc., also known as National Grid USA (National Grid), subsequently became the corporate successor to NEES.

3. *Indirect liability as an operator: piercing the corporate veil.* As we have said, NEES is not a present owner or operator of the Northey Street site, and is not directly liable to the plain-

tiff under G. L. c. 21E, § 5 (*a*) (1). *Griffith* v. *New England Tel. & Tel. Co.*, 414 Mass. 824, 827 (1993), *S.C.*, 420 Mass 365 (1995) (former lessee of site not liable as present operator). See *Scott* v. *NG US 1, Inc.*, *supra* at 478 (rejecting proposition that entity remains "present operator" of site until hazardous wastes removed). The question we now consider is whether NEES, which acquired a controlling interest in Salem Gas many years after the environmental release, may be derivatively liable for Salem Gas's actions as a past operator under G. L. c. 21, § 5 (*a*) (2) or (5).[11] See note 4, *supra.*

The conduct giving rise to liability under G. L. c. 21E, § 5 (*a*) (5), is "caus[ing]" or being "legally responsible" for the release or threat of release of oil or hazardous material. Under § 5 (*a*) (5), therefore, "a past owner or operator of a site contaminated by oil can be held liable if that person 'caused' a release or threat of a release of oil from the site," or is otherwise legally responsible for it.[12] *Griffith* v. *New England Tel. & Tel. Co.*, *supra* at 830. See G. L. c. 21E, § 5 (*a*) (2) (liability rests on ownership or operation of a site "at the time" of storage or disposal). Assuming, for purposes of summary judgment, that Salem Gas — a past owner or operator — "caused or is legally responsible for a release," G. L. c. 21E, § 5 (*a*) (5), the question is whether NEES — which acquired its interest in Salem Gas decades after both the environmental contamination and sale of the site — is indirectly liable for that release through application of corporate veil piercing concepts. We think not.

Neither Federal (CERCLA) nor State environmental laws

[11]In his complaint, the plaintiff alleged that the defendants are "persons liable pursuant to [G. L.] c. 21E, §§ 5 (*a*) (1) and 5 (*a*) (5)[,] as the owner/operator and/or as a person who otherwise caused and continues to cause an oil and/or hazardous materials release on to the Property." Although he made no specific claim under § 5 (*a*) (2), many of the cases on which he relies involve that section.

[12]In this context, neither "legal responsibility" nor "causation" is synonymous with ownership. See *Commonwealth* v. *Boston Edison Co.*, 444 Mass. 324, 335 (2005) (no legal responsibility within meaning of G. L. c. 21E, § 5 [*a*] [5], absent duty to act); *Griffith* v. *New England Tel. & Tel. Co.*, 420 Mass. 365, 369 (1995) ("it is clear from the statute's different treatment of petroleum releases that there must be more than a showing that the defendant previously owned the site, brought oil onto the property, or stored oil on the property to establish causation under § 5 [*a*] [5]"). See also *Marenghi* v. *Mobil Oil Corp.*, 420 Mass. 371, 374 (1995).

displace bedrock principles of corporate common law. See, e.g., *United States* v. *Bestfoods*, 524 U.S. 51, 61-62 (1998). See generally *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294 (1997). One of the basic tenets of that body of law is that corporations — notwithstanding relationships between or among them — ordinarily are regarded as separate and distinct entities. See, e.g., *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546, 555 (2000); *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968). See also *United States* v. *Bestfoods, supra.*

> "Thus it is hornbook law that 'the exercise of the "control" which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary. That "control" includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal.' "

*Id.*, quoting Douglas, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 196 (1929) (Douglas). Indeed, the concept that "a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries," is "deeply 'ingrained in our economic and legal systems,' " *United States* v. *Bestfoods, supra* at 61, quoting Douglas, *supra* at 193, and assures that "the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary." *United States* v. *Bestfoods, supra* at 61-62. Also settled is the equilibratory concept that the corporate veil between parent and subsidiary corporations may be pierced when, "inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud."[13] *Id.* at 62. Cf. 1 W.M. Fletcher, Cyclopedia of Corporations § 43, at 286-290 (rev. ed 2006) ("There is a

---

[13]In considering whether to disregard the corporate form of the defendant NG US 1, Inc.'s predecessor, New England Electric System (NEES), we apply Massachusetts law. Apart from NG US 1, Inc., a Delaware corporation, which succeeded NEES after NEES sold its interest in Salem Gas, it is undisputed that the entities involved in the corporate transactions in this case were organized in Massachusetts, and the parties have not argued that the law of any other State applies. Compare *Evans* v. *Multicon Constr. Corp.*, 30 Mass.

presumption of separateness that a plaintiff must overcome to establish liability by showing that a parent is employing a subsidiary to perpetrate a fraud or commit wrongdoing and that this was the proximate cause of the plaintiff's injury"). "Nothing in CERCLA purports to rewrite this well-settled rule. . . ." *United States* v. *Bestfoods, supra* at 63.

In Massachusetts, the equitable doctrine of corporate disregard differs in no material respect from the description in *United States* v. *Bestfoods, supra* at 62-63, and nothing in G. L. c. 21E displaces the doctrine's established scope. In the environmental context, as in other contexts, corporate veils are pierced only in "rare particular situations," and only when an "agency or similar relationship exists between the entities." *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 619, 620. A veil may be pierced where the parent exercises "some form of pervasive control" of the activities of the subsidiary "*and* there is some fraudulent or injurious consequence of the intercorporate relationship." *Id.* at 619. See *Hanson* v. *Bradley*, 298 Mass. 371, 381 (1937) ("The right and the duty of courts to look beyond the corporate forms are exercised only for the defeat of fraud or wrong, or the remedying of injustice"). See also 1 W.M. Fletcher, Cyclopedia of Corporations, *supra* at § 43, at 292 ("the injured party must show some connection between its injury and the parent's improper manner of doing business — without that connection, even when the parent exercises domination and control over the subsidiary, corporate separateness will be recognized"). Corporate formalities also may be disregarded "when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise *with substantial disregard of the separate nature of the corporate entities*, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting" (emphasis added). *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 619. Stated more directly,

App. Ct. 728, 737 n.7 (1991) (applying Massachusetts law of veil piercing), with *Lily Transp. Corp.* v. *Royal Inst. Servs., Inc.*, 64 Mass. App. Ct. 179, 188 n.15 (2005) (whether corporation's veil could be pierced to impose G. L. c. 93A liability on shareholders governed by law of corporation's place of incorporation), and *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999) (when "court considers disregarding the corporate entity . . . [it] applies the law of the state of incorporation").

control, even pervasive control, without more, is not a sufficient basis for a court to ignore corporate formalities: "There is present in the cases which have looked through the corporate form an element of dubious manipulation and contrivance [and] finagling . . . ." *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 736 (1991). See *United States* v. *Bestfoods, supra* at 62 (veil piercing appropriate when, "inter alia, the corporate form would otherwise be used to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf"); 1 W.M. Fletcher, Cyclopedia of Corporations, *supra* at § 43, at 296 ("although corporations are related, there can be no piercing of the corporate veil without a showing of improper conduct"). Ultimately, the decision to disregard settled expectations accompanying corporate form requires a determination that the parent corporation directed and controlled the subsidiary, and used it for an improper purpose, based on evaluative consideration of twelve factors:

> "(1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) *use of the corporation in promoting fraud*" (emphasis added).

*Attorney Gen.* v. *M.C.K., Inc., supra* at 555 n.19, citing *Pepsi-Cola Metro. Bottling Co.* v. *Checkers, Inc.*, 754 F.2d 10, 15-16 (1st Cir. 1985) (categorizing *My Bread Baking Co.* factors).

In this case, the plaintiff makes no claim of "fraudulent or injurious consequence" under the first of the *My Bread Baking Co.* prongs, but relies instead on the second prong: confused intermingling with "substantial disregard of the separate nature of the corporate entitles." *Id.* He contends that during the period of 1931 to 1973, there is evidence of operational integration of the operations of NEES and the entities to which business of Salem Gas succeeded, including financial operations. Beginning in 1951, he alleges that Salem Gas and its successors were

operated as an integrated part of NEES, without regard to corporate formality, and when the business of Salem Gas was sold, only NEES received the resulting funds.

Assuming, for summary judgment purposes, that Salem Gas's conduct, ownership, or operation of the Northey Street site during the 1800's meets the requirements of G. L. c. 21E, § 5 (*a*) (2) or (5), that activity concluded decades before any alleged "pervasive control," with "fraudulent or injurious consequence" or "confused intermingling . . . with substantial disregard of the separate nature of the corporate entities." *My Bread Baking Co.* v. *Cumberland Farms, Inc., supra* at 619.[14] In this case, NEES's corporate form may not be pierced to impose liability for actions taken (or not taken) by another entity long before the formation of a corporate relationship.[15,16]

[14]In his summary judgment materials, the plaintiff alleges that between 1931 and 1951, Salem Gas operated as a "nominal subsidiary" of NEES, although it was an integrated part of NEES's business. He alleges that after 1951, the business of Salem Gas was operated by NEES without regard to corporate formality. Among other things, he alleges that NEES and its various gas subsidiaries, including Salem Gas, shared employees, management, marketing, supply, operations and merchandising; that the president of Salem Gas and other NEES gas subsidiaries was also the head of the unincorporated gas division of NEES; and that final authority on important matters rested with NEES management. The question before us is not whether the corporate veil could be pierced at some point after 1931, but rather whether it should be pierced during the time of the release or threatened release of oil or hazardous material. While we need not decide whether the corporate veil could be pierced at any other point in time, we are dubious that the summary judgment record in this case, particularly lacking substantial evidence of impropriety or injurious consequences of the corporate relationship, would support application of the doctrine. See 1 W.M. Fletcher, Cyclopedia of Corporations § 43, at 296 (rev. ed 2006).

[15]While the Appeals Court suggests that "gas manufacturing companies in Massachusetts were aware of certain health and environmental dangers posed by their coal to gas operations in the late 1800's," *Scott* v. *NG US 1, Inc.*, 67 Mass. App. Ct. 474, 484 (2006), it identified no source of a pre-1973 continuing duty to investigate possible contamination on properties sold by a related entity decades before there was any corporate relationship. The plaintiff likewise has not suggested, prior to NEES's sale of its interest in Salem Gas in 1973, the source of NEES's alleged duty to assess and remediate possible environmental contamination on property owned (since the turn of the century) by a third party or parties with whom NEES apparently had no relationship at all. We accordingly focus on the original hazardous material releases (in the 1800's), rather than on any continuing failure to remediate.

[16]By construing *Attorney Gen.* v. *M.C.K., Inc.*, 432 Mass. 546 (2000), to

In determining whether one entity exercised "pervasive control" over another, and whether "confused intermingling" exists sufficient to disregard the corporate formalities, we focus on the events giving rise to liability: in this case, causing a release or threatened release, or owning or operating the facility at that time.[17] See *Attorney Gen.* v. *M.C.K., Inc.*, *supra* at 557 n.20 (determining whether control exercised at time of relevant acts); *Evans* v. *Multicon Constr. Corp.*, 30 Mass. App. Ct. 728, 732 n.6 (1991) (rejecting without discussion piercing claim against partners who withdrew before relevant acts); *Pepsi-Cola Metro. Bottling Co.* v. *Checkers, Inc.*, *supra* at 16-17 (distinguishing case in which parent acquired subsidiary after event at issue"); *United States* v. *Wallace*, 961 F. Supp. 969, 979 (N.D. Tex. 1996). See also *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra* at 620-621 (analyzing whether, in refusing to return bread racks, subsidiary corporation acted as parent corporation's agents). See generally 1 W.M. Fletcher, Cyclopedia of Corporations, *supra* at § 41.10, at 143-144 (while various jurisdictions apply different veil-piercing factors, they commonly require

---

authorize disregard of corporate form based on general statutory and policy goals, rather than evaluation of the factors in *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, 353 Mass. 614 (1968), the Appeals Court read the *M.C.K., Inc.*, case broadly. *Scott* v. *NG US I, Inc.*, *supra* at 480. In *M.C.K., Inc.*, we recognized only that frustration of a statutory scheme, *when coupled with* pervasive control and confused intermingling of activity and assets, supported corporate veil piercing. Absent evidence that "an agency or similar relationship exists between the entities," *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra* at 619, violation by one corporation of its obligations presents no occasion to disregard the corporate form of another corporation. Put another way, the statutory purpose of G. L. c. 21E, regulating "cleanup of sites contaminated with hazardous material," *Commonwealth* v. *Boston Edison Co.*, 444 Mass. 324, 328 (2005), is not advanced by doing violence to bedrock principles of corporate law. Cf. *John Boyd Co.* v. *Boston Gas Co.*, 775 F. Supp. 435, 442 (D. Mass. 1991) ("Notwithstanding the noble social purposes embodied in CERCLA, there is nothing peculiar to the problem of hazardous waste disposal that, in the absence of Congressional direction, would justify a policy that would ignore the corporate form altogether in these types of cases").

[17]Both *My Bread Baking Co.* v. *Cumberland Farms, Inc.*, *supra*, and *Attorney Gen.* v. *M.C.K., Inc.*, *supra*, involved attempts to impose liability on a parent corporation for acts of a subsidiary during the existence of a parent-subsidiary relationship. In this case, however, the environmental release occurred — and the Northey Street site was sold — more than thirty years before the parent's predecessor acquired any interest in the subsidiary.

control with respect to transaction at issue, such that, at that time, controlled corporation lacked "no separate mind, will or existence of its own"). Cf. *Lily Transp. Corp.* v. *Royal Inst. Servs., Inc.*, 64 Mass. App. Ct. 179, 188 (2005) ("Stockholders who are not involved in the improper transaction or wrongdoing are not liable even when the corporate veil is pierced"). We agree with the Superior Court judge's conclusion that, "in the absence of some very special facts, a parent corporation should not be held responsible by veil piercing for the acts of a subsidiary that occurred decades before the parent acquired the subsidiary."

In the present case, the environmental releases occurred — and the contaminated property was sold — more than thirty years before North Boston purchased its first share of stock in Salem Gas, and before NEES's predecessor, NEPA, purchased its first share of stock in North Boston. The plaintiff does not suggest that NEPA's acquisition of North Boston was related to the then-discontinued operations at a site no longer owned by Salem Gas. Nor was there evidence that NEES had any ability to direct or control environmental measures on a site sold decades before, let alone any duty to do so. Indeed, G. L. c. 21E was enacted in 1983, ten years after NEES sold its interest in Salem Gas, and the plaintiff has identified no other source of statutory or common-law obligation of NEES (or of Salem Gas) during the period NEES had such an interest, to investigate, identify, or respond to possible environmental contamination from coal tar caused decades before, on property not owned by NEES or related entities. Cf. *John S. Boyd Co.* v. *Boston Gas Co.*, 992 F.2d 401, 408 (1st Cir. 1993) (parent corporations liable "for the oil gas waste created while they were linked to the Lynn Gas Co.").

We do not doubt that an important objective of G. L. c. 21E is prompt "assessment, containment and removal," G. L. c. 21E, § 4, of hazardous materials. Nor do we question that the party that caused the environmental contamination should be responsible for its cleanup. *Garweth Corp.* v. *Boston Edison Co.*, 415 Mass. 303, 307 (1993). But it does no injustice to G. L. c. 21E to conclude that where the parent corporation lacked any interest in, and did not control, the subsidiary or its facility at the time of the acts giving rise to environmental liability, there is no occasion to

disregard its corporate form. Summary judgment properly was granted to NEES.

4. *Attorney's fees.* General Laws c. 21E, § 4A (*f*), requires a court to award litigation costs and reasonable attorney's fees to a defendant if it finds "(1) the plaintiff did not participate in negotiations or dispute resolution in good faith; (2) the plaintiff had no reasonable basis for asserting that the defendant was liable, or (3) the plaintiff's position with respect to the amount of the defendant's liability pursuant to the provisions of this chapter was unreasonable." The Superior Court judge, though properly granting summary judgment to the defendants on liability, denied their § 4A (*f*) litigation costs and attorney's fees request. He rejected the defendants' arguments that (1) the plaintiff had no reasonable basis for asserting liability; and (2) the plaintiff failed to negotiate in good faith by failing to explain the legal basis for his claim, and by failing to provide detailed information on the contamination and remediation.

As to the first point, the judge reasoned that the test whether the plaintiff "had no reasonable basis for asserting that [the defendants were] liable," G. L. c. 21E, § 4A, is akin to the inquiry whether a complaint would survive a motion to dismiss under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974): that is, based on the facts known to the plaintiff at the time the complaint was filed, whether it appeared "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief viewing the complaint." *Marram* v. *Kobrick Offshore Fund, Ltd.*, 442 Mass. 43, 45 (2004), quoting *Warner Lambert Co.* v. *Execuquest Corp.*, 427 Mass. 46, 47 (1998). He concluded, quoting *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), that given that the corporate history leading from Salem Gas to the defendants was "far from transparent," and notwithstanding that *John S. Boyd Co.* v. *Boston Gas Co.*, *supra* at 404 (addressing 1973 transaction between defendants), and *Longview Fibre Co. vs.* Boston Gas Co., U.S. Dist. Ct., No. 92-10284-WD (D. Mass. Sept. 10, 1993), strongly signaled weakness in the plaintiff's claims with respect to Boston Gas, it could not be said "that when filed, 'it appear[ed] beyond doubt that the [Trust could] prove no set of facts in support of [its] claim which would entitle [it] to relief.' " While recognizing

that the claims against NEES are "admittedly thinner," given that NEES did not acquire Salem Gas stock until well after the contaminated site was no longer owned by Salem Gas and the site was no longer operational, the judge concluded that the plaintiff's position was neither irrational nor unreasonable.

In evaluating the plaintiff's claims, the Superior Court judge applied the incorrect standard. At issue under G. L. c. 21E, § 4A, is not whether it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief viewing the complaint," *Marram* v. *Kobrick Offshore Fund, Ltd., supra,* but rather whether "the plaintiff had no reasonable basis for asserting that the defendant was liable." G. L. c. 21E, § 4A (*f*). Cf. *Commonwealth* v. *Cahill*, 442 Mass. 127, 134 (2004) (Legislature could have, but did not, impose standard other than that provided in statute). Put another way, the question is whether, when the complaint was filed, application of the facts to existing law made it reasonably clear that the defendants were not liable under G. L. c. 21E. See *Hill* v. *Metropolitan Dist. Comm'n*, 439 Mass. 266, 278 (2003); *Buddy's Inc.* v. *Saugus*, 62 Mass. App. Ct. 256, 262-263 (2004). We do not presume to speculate about the conclusion the Superior Court judge might have reached if the "reasonable basis" standard had been applied. Accordingly, we remand this case to the Superior Court to consider whether the plaintiff had "no reasonable basis" to assert liability on the part of Boston Gas or NEES.

In addition, G. L. c. 21E, § 4A (*f*) (1), requires an award of fees if the plaintiff "did not participate in negotiations or dispute resolution in good faith." In evaluating the plaintiff's actions in this regard, the Superior Court judge interpreted G. L. c. 21E, § 4A (*a*), as permitting, but not requiring, the plaintiff to give notice to the defendant prior to filing suit. Existing case law requires compliance with § 4A procedures prior to commencement of litigation. See, e.g., *Martignetti* v. *Haigh-Farr, Inc.*, 425 Mass. 294, 322 (1997) ("only after such notice and procedures [under G. L. c. 21E, § 4A (*a*) and (*b*),] may a civil action be brought"); *Buddy's Inc.* v. *Saugus, supra* at 261-262 (prelitigation notification "required of plaintiffs as a condition of initiating a lawsuit"); *Rudnick* v. *Hospital Mtge. Group, Inc.*, 951

F. Supp. 7, 9 (D. Mass. 1996) (actual, though not perfect, notice sufficient to confer jurisdiction under G. L. c. 21E). On remand, the Superior Court judge may consider whether the mandatory nature of the predispute notice requirement affects the analysis regarding the comportment of the plaintiff's predispute activities with the requirements of good faith. See *Hill* v. *Metropolitan Dist. Comm'n, supra.*

5. *Conclusion.* On the facts contained in the summary judgment record, this case does not present a "rare situation," *Attorney Gen.* v. *M.C.K., Inc., supra* at 555, warranting piercing the corporate veil of NEES to impose indirect liability for the environmental wrongdoing by Salem Gas more than one century ago. We affirm the decision of the Superior Court judge granting summary judgment to all defendants. We vacate the order denying the defendants' motions for litigation costs and attorney's fees, and we remand for further proceedings on those motions, consistent with this decision.

*So ordered.*